# EXHIBIT 6

## Defendant's Motion for Summary Judgment

## Chris Stewart v. Hy-Vee, Inc.
## Case No. 5:24-cv-06123-RK

Rodney L. Dolph - May 08, 2025

Chris Stewart vs Hy-Vee, Inc.



Quality transcripts. On time.

**(913) 825-2510**

8700 Monrovia, Suite 310

Lenexa, Kansas 66215-3500

Fax (913) 825-2530

www.cornerstonekc.net

office@cornerstonekc.net

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MISSOURI

WESTERN DIVISION

CHRIS STEWART,

Plaintiff,

vs.                    Case Number 5:24-CV-06123

HY-VEE, INC.,

Defendant.

VIDEO-RECORDED DEPOSITION OF RODNEY L. DOLPH, a witness, taken on behalf of the Plaintiff, pursuant to Notice, on May 8, 2025, at the offices of MURPHY & MURPHY, PC, 3101 Frederick Avenue, Suite B, St. Joseph, Missouri 64506, before

SUSAN J. MUCKENTHALER

Certified Verbatim Reporter, Certified in Missouri and Kansas.

---

**Page 2**

APPEARANCES

For the Plaintiff:

MR. KYLE E. MURPHY
MURPHY, KINNEY & SUMY, LLC
406 West 34th Street, Suite 816
Kansas City, Missouri  64111
kyle@murphykinney.com
(816) 281-5470

For the Defendant:

MS. JEANNIE M. DeVENEY
LITTLER MENDELSON, PC
1201 Walnut Street, Suite 1450
Kansas City, Missouri  64106
jdeveney@littler.com
(816) 627-4400

Videographer:

MS. MELISSA MURPHY
MURPHY, KINNEY, & SUMY, LLC

Also present:

Ms. Cate Riddle

---

**Page 3**

TABLE OF CONTENTS

EXAMINATION

Questions By Mr. Murphy                5

Questions By Ms. DeVeney              103

Questions By Mr. Murphy              106

EXHIBITS

1 - "Petition for Damages"                62

2 - "Defendant Hy-Vee, Inc.'s Answers to        62
    Plaintiff's First Set of Interrogatories"

3 - "Unemployment Verification"           67

4 - Termination form                68

5 - 6/6/23 email from Stewart to Dolph        70

6 - Email chain ending with 8/22/23 email from   71
    Riddle to Dolph

7 - Unemployment hearing form           75

8 - Hy-Vee "Introduction," "Company Policies,"  77
    "Work Place"

9 - Hy-Vee "Employee Handbook"          78

10 - 6/4/21 letter from Orr re: burn          80
    surgery/burn care

11 - Stewart performance review, 2/28/22       81

12 - Screenshots                82

---

**Page 4**

TABLE OF CONTENTS (Continued)

13 - Register transactions            87

14 - Handwritten notes             88

15 - List of positions held and time sheets at   88
    Hy-Vee

16 - Register receipts             90

17 - Job description for produce clerk         92

CERTIFICATE OF REPORTER              109

ERRATA SHEET                110

SIGNATURE PAGE                111

Reporter's Note:  The original exhibits were retained by Mr. Murphy.

(ph) indicates a phonetic spelling.

[sic] indicates the text is as stated.

Quoted text is as stated by the speaker.

---

Page 5

THE REPORTER: Good morning. My name is Susan Muckenthaler. I am a Missouri-certified court reporter. We are now on the record. Today's date is May 8th, 2025, and the time is approximately 10:10 a.m.

This is the video-recorded deposition of Rodney Dolph in the matter of Chris Stewart versus Hy-Vee, Incorporated, Case Number 5:24-CV-06123.

Would counsel please identify yourselves and whom you represent.

MR. MURPHY: Kyle Murphy for the plaintiff, Christopher Stewart.

MS. DeVENEY: And Jeannie DeVeney for the defendant.

RODNEY L. DOLPH, a witness, being first duly sworn, testified under oath as follows:

EXAMINATION

BY MR. MURPHY:

Q. And we have briefly introduced ourselves. Again, my name, as I just mentioned, is Kyle Murphy. I represent the plaintiff in this case, Christopher Stewart. And today is my opportunity to get your knowledge about the facts and circumstances of this case. And so with that, we'll go ahead and -- and

Page 6

get started.

Can you please go ahead and state and spell your full name for the record.

A. Rodney Lee Dolph, R-o-d-n-e-y L-e-e D-o-l-p-h.

Q. And have you used any other names before?

A. I use Rod Dolph. So I don't -- I don't go by Rodney most of the time. I go by Rod.

Q. Okay. And what is your date of birth?

A. 10/13 of 1967.

Q. What is your current address?

A. 4402 Valley Ridge Drive, St. Joe, Missouri.

Q. And is that 64506?

A. 64505.

Q. Okay. And assuming you have a work email address?

A. I do.

Q. What is that under?

A. Rdolph@hyvee.com.

Q. Have you used any other work email addresses at Hy-Vee?

A. No, not to my knowledge.

Q. Do you have any social media accounts?

A. I do not.

Page 7

Q. In the event that you would be a witness in this case if it goes to trial, I'm going to ask you a few questions about your family relationships because some of those folks could end up on a jury. Okay?

A. Okay.

Q. Are you single or married?

A. Married.

Q. And who is your spouse?

A. Traci Dolph.

Q. And do you have any adult children?

A. Yes. Two.

Q. Do any of them live in the St. Joseph area?

A. No.

Q. Okay. And do you have any parents or other living family members that live in the St. Joseph area?

A. No.

Q. There's really just a few pretty important rules for this deposition moving forward. The first one is the court reporter is taking down everything that we're saying. So it's important that you answer with words rather than with a nod or shake of the head. Does that make sense?

Page 8

A. Yes.

Q. And it's just a natural thing to move our heads, you know. But do the best you can there. I'll try to remind you if I -- if I see you nod your head or shake your head. Okay?

A. That will work, yes.

Q. And then the second rule is just to make it easy for the court reporter to record what we say accurately, it's important that we not interrupt each other or talk over one another because that's just going to make the court reporter's job really difficult. And I can probably tell you that we're going to do this a time or two. But if -- if we do get to interrupting each other, let's just try to, you know, remind ourselves not to do that. Okay?

A. Sounds good.

Q. Do you understand that when I mention Hy-Vee throughout today's deposition that I'm referring to Hy-Vee, Incorporated, the defendant in this lawsuit?

A. Yes.

Q. And do you also understand that when I mention "plaintiff" or Chris or Mr. Stewart throughout today's deposition that I'm referring to Chris Stewart, the plaintiff in this lawsuit?

Page 9

A. I do.

Q. And I will also note that if you need to take a break at any point, just let me know. I'm going to try to take a break at least about every hour. Okay?

A. Okay.

Q. And is it fair to say that you've been deposed once or twice prior to today?

A. Yes.

Q. And was the last time in connection with a trip-and-fall incident?

A. I believe so, yes.

Q. And that was at some point last year?

A. Yes.

Q. Okay. And then before that, you've been deposed once or twice?

A. Yes.

Q. Okay. And those were other lawsuits that Hy-Vee was involved in?

A. Yes.

Q. Okay. And in some of those depositions, were you the designated representative for the company? For Hy-Vee?

A. Yes.

Q. Okay. Have you done anything to prepare

Page 10

for today's deposition?

A. Yes.

Q. And what have you done to prepare?

A. I have talked with our attorney.

Q. And did you review any specific documents?

A. Yes.

Q. Okay. And which ones did you review?

A. I don't know exactly what it's called, but I believe it was my deposition that I had talked to Jeannie about, I believe, is what I looked at.

MS. DeVENEY: I -- I think he means interrogatory answers.

MR. MURPHY: Okay.

MS. DeVENEY: Yeah?

A. That sounds right. Yeah, I don't -- I'm not that familiar with this kind of stuff. So ...

Q. (By Mr. Murphy) Any other documents that you remember reviewing for today?

A. No. I -- I mean, not to my knowledge, no.

Q. Okay. And about -- I don't want to know what you or your attorney, you know, talked about. But, I mean, did you -- how many times did you speak with your attorney, or was it just once?

MS. DeVENEY: Objection. Vague.

Q. (By Mr. Murphy) In preparation for today.

Page 11

A. Once.

Q. Other than Hy-Vee's attorney, have you spoken to anyone else about this lawsuit or your deposition today?

A. To my knowledge, no.

Q. What is the highest level of education that you have received?

A. I have a two-year business degree from Des Moines Area Community College.

Q. And what years did you go there?

A. Okay. You're dating me here. 1986 to, I believe, 1988.

Q. Okay. And did you obtain a degree or certificate from there?

A. Yeah. Associate -- associate's degree in retail management and business.

Q. Okay. And before that, assuming you went to high school?

A. I did.

Q. Where did you go?

A. Johnston High School in Johnston, Iowa.

Q. Okay. And what -- what year did you graduate from there?

A. 1986.

Q. And you graduated?

Page 12

A. Yes.

Q. Okay. Is there any other education that you have received to prepare you for your current job?

A. Yes. There -- there's some classes that Hy-Vee puts you through through department training. So I've been through an extensive amount of training in several departments -- produce, meat, kitchen, pharmacy, several diff- -- several departments throughout the store.

Q. Okay. Any other education that you've received?

A. We just have continuous education when -- when it comes to food safety and things like that that are ongoing throughout the years. So yes.

Q. Okay. Any other education?

A. No.

Q. Have you received any special training outside of your employment to prepare you for your current job or career?

A. No.

Q. Have you received any certificates in connection with your current job or career other than the associate's degree that we talked about?

A. I've received some just going through my

Page 13

training. I receive certificates when we -- so every department you go through, you test out of. So I received certificates for all of that training for all those departments that I went through.

Q. Okay. Any other certificate outside of what you just told me?

A. To my knowledge, no.

Q. And you're currently employed at Hy-Vee; correct?

A. Correct.

Q. And is your current job title the store director?

A. Yes.

Q. And that is in connection with the St. Joseph, Missouri, store?

A. Yes.

Q. And what is the address of that store?

A. 201 North Belt, St. Joseph, Missouri 64505.

Q. And when did you start working in that position?

A. At -- at the St. Joe location?

Q. Yes.

A. I would have came here in April of 2021.

Q. And what are your job duties as the store director?

Page 14

A. Everything from cleaning floors to bagging groceries to stocking shelves. I -- I do just about everything in that store.

Q. And what qualifications do you have to be in that position?

A. Years of experience. I started at 17 in the grocery business and worked my way up to where I'm at through several different positions in the store to become a store director.

Q. Is this the only job you currently have?

A. Yes.

Q. And is this job your primary source of income?

A. Yes.

Q. Do you rely on your income from Hy-Vee to pay your bills?

A. Yes.

Q. What is your annual salary as the store director?

A. Is that information I need to share?

MS. DeVENEY: What's the relevance?

MR. MURPHY: To the -- I don't think I need to say the relevance.

Q. (By Mr. Murphy) But the pending

Page 15

question -- are you going to answer the question?

MS. DeVENEY: Well, if -- if you can explain why it's discoverable, then he can answer the question.

MR. MURPHY: At this point, this is a speaking objection. I don't need to explain. This is my deposition. I'm taking -- so I'm entitled to know this information. This was one of my client's supervisors.

Q. (By Mr. Murphy) So are you going to answer the question?

A. How is it relevant to the case?

Q. Sir, this is your deposition, and I'm asking you questions under oath.

I will ask you one more time: What is your annual salary as the store director at Hy-Vee?

MS. DeVENEY: What --

A. 200- --

MS. DeVENEY: Go ahead.

A. 200,000.

Q. (By Mr. Murphy) And who is your direct supervisor?

A. Brad Auge.

Q. And who is his direct supervisor?

A. Let me think here. Drew Holmes.

Page 16

Q. And what position is Brad Auge in?

A. He's a regional vice president.

Q. How do you spell Auge?

A. A-u-g-u-e [sic].

Q. And where does he primarily office out of? Mr. Auge?

A. He would be employed by the corporate office, but his main job is to travel. He has 17 stores. So the bulk of his time is traveling to stores and checking conditions in those stores.

Q. And then what position is Drew Holmes in?

A. He would be a senior vice president.

Q. And who does Drew Holmes report to?

A. Jeremy Gosch.

Q. And what's his position?

A. He's actually the CEO of the company. Drew Holmes would also report -- before you got to Mr. Gosch, he would report to Jeff Mueller.

Q. And what's his position?

A. I don't know exactly what his position title would be. He oversees the entire operation of retail side of this company.

Q. And this kind of chain of command that we've kind of laid out here -- was that different at all in 2023, or was it the same?

Page 17

A. It would be the same channel of command. It could have had different people in different roles. But the -- as far as the hierarchy goes of the company, it should have been the same.

Q. And about how many employees work at the St. Joseph Hy-Vee currently?

A. Approximately -- approximately 350.

Q. And was it around that same number in 2023?

A. Probably pretty close. It does fluctuate, you know, by 20 or 30 at times based on when the kids go back to college and -- and those type of things. But on an average, we probably average around 350 employees at any given time.

Q. And do you know how many employees work for Hy-Vee nationwide, approximately?

A. Approximately 76,000.

Q. And who is the manager that works directly under you?

A. Tina Evans.

Q. And what's her job title?

A. Store manager.

Q. And she was also in that position in 2023?

A. Correct.

Q. And then who are her direct reports?

Page 18

A. She would have -- Alyssa Lewis would be the manager of perishables.

Q. Who else?

A. Chase Marsh would be manager of store operations.

Q. Any others?

A. Trish Rodriguez would be health and wellness manager.

Q. Any others?

A. Donald Woodruff [sic]. And he would be assistant manager of general merchandise.

Q. Was Barry Stewart one of them?

A. Yeah. So all of the department managers -- there's 21 department managers. So they would all report to either Tina or myself.

Q. Are there any department managers that worked for Hy-Vee in 2023 that no longer work there?

MS. DeVENEY: You mean at the -- I assume you mean at the St. Joe store?

MR. MURPHY: Right. Yeah.

MS. DeVENEY: Yeah.

A. I have one in Chinese and Italian that no longer works there.

(Reporter clarification.)

A. I -- I have a -- a department manager that

Page 19

oversees Chinese and Italian that's no longer there.

Q. (By Mr. Murphy) Do you recall that person's name?

A. I do not.

Q. Any others you can recall that don't work there anymore?

A. To my knowledge, no.

Q. And how many managers are there in the produce department?

A. Two.

Q. And who are those people?

A. Barry Stewart and Cade (ph), and I can't -- I can't remember how to spell his last name.

Q. About how many employees work in the produce department?

A. Probably eight to ten.

Q. And can you identify any of those eight to ten employees aside from the managers?

A. Yes. Cole -- and, again, last names I'm not great with. Cole works there. Grace works there. Phil works there. And he's got numerous part-timers that work one or two days a week.

Q. Are you aware of any other employees in the produce department at Hy-Vee St. Joseph store

Page 20

that worked there in 2023?

MS. DeVENEY: That weren't there? Is that what you said?

MR. MURPHY: That worked there.

MS. DeVENEY: That worked there. Okay.

MR. MURPHY: Uh-huh.

A. No.

Q. (By Mr. Murphy) Are you aware of an employee by the name of Caleb that worked in that department?

A. I can't say yes. No, no.

Q. Okay. Prior to becoming the store director at the St. Joseph Hy-Vee store, what was your position at Hy-Vee?

A. I was the store director at the Jefferson City, Missouri, location.

Q. And when did you start in that position?

A. Would have been January of 2005.

Q. And were your job duties similar at that store as compared to your current job?

A. Yes.

Q. What was your -- your reason for transferring from that store to the St. Joe store?

A. I -- I was asked to come to this location by the CEO of the company. And this is a higher

Page 21

volume store for me, and I like the -- I've worked in small stores and large stores. I just like the high-volume aspect of the business.

Q. Have you held any other jobs at Hy-Vee?

A. Yes.

Q. And can you just, in chronological order from the most recent, in terms of the most recent one before store director at the Jeff City store on back as far as you can remember.

A. I was an assistant director at the Ankeny, Iowa, location. And before that, I was a manager of operations at the West Des Moines Number 2 location on Grand Avenue in West Des Moines. And before that, I was a service manager at West Des Moines Number 1 location in -- in West Des Moines, Iowa.

And before that, I was a service manager at the Johnston Hy-Vee location as a service manager. And before that, I would have -- that's about when I started with Hy-Vee. I would have been a checker and a bagger and stocker and all those things. But we're talking 40 years ago. So I don't remember everything chronological order necessarily but ...

Q. When did you start working at Hy-Vee?

A. June of 1985.

Page 22

Q. And did you ever work at any other places since then, or has it only been Hy-Vee?

A. I worked for a competitor of Hy-Vee for a year. Would have been -- back in 1984 I worked for a local grocery chain in Des Moines, Iowa, for a year.

And then prior to that, when I was 14 years old, I worked -- my aunt and uncle owned a cleaning business in Des Moines; so I helped clean office buildings at 14. Did that until I went to work for Dahl's Foods when I turned 16.

Q. Okay. Have you ever been -- strike that.

Have you ever received any disciplinary action from Hy-Vee when you were working as a store director at either the Jeff City or the St. Joe stores?

A. No.

Q. And how much were you making at the Jeff City Hy-Vee store before you came over to St. Joe?

A. My salary at the Jeff City store -- I can't remember if it would have been 110,000 or 150,000.

Q. What is the MCHR?

A. I'm not sure. Could you -- could you give me the whole, not the abbreviation of it.

Page 23

Q. Do you know what the EEOC is?

A. Is that equal employment for everyone? Is that what that is?

Q. Do you know what the Missouri Human Rights Act is?

A. I've heard of it.

Q. Okay. What have you heard?

A. I've heard that terminology. And that's about all I've heard.

Q. What training do you have with respect to the Missouri Human Rights Act?

MS. DeVENEY: Objection. Form of the question.

A. I'm not sure.

Q. (By Mr. Murphy) What is the ADA?

A. It's a disability act, I believe.

Q. What training do you have with respect to the ADA?

A. We have continuous training at my director meetings and things on those type of topics.

Q. Is there anything specific you can recall about the training?

A. No.

Q. Was it ever part of your job to help Hy-Vee comply with the Missouri Human Rights Act?

Page 24

MS. DeVENEY: Objection. Form of the question.

A. We don't -- we don't discriminate against anyone, if that's what you're asking.

Q. (By Mr. Murphy) What, if anything, did you do to help Hy-Vee comply with the Missouri Human Rights Act?

MS. DeVENEY: Objection. Form of the question. Overly broad.

A. Could you rephrase that.

Q. (By Mr. Murphy) I will try.

What did you do, if anything, to assist Hy-Vee with making sure that it was adhering to the Missouri Human Rights Act?

MS. DeVENEY: Same objections.

A. We -- we just hire ev- -- we just hired -- try to hire the best individuals that we can for every position in the store.

Q. (By Mr. Murphy) Okay. Anything else?

MS. DeVENEY: Same objections.

A. I have nothing more.

Q. (By Mr. Murphy) Does Hy-Vee have a policy regarding discrimination?

A. Yes.

Q. And what's your understanding of that

Page 25

policy?

A. The -- we do not discriminate against anyone.

Q. Do you have any further understanding of that policy?

A. Again, in a nutshell, we do not discriminate, period.

Q. And do you have any further understanding of that policy?

MS. DeVENEY: Objection. Vague.

A. Could you give me more details.

Q. (By Mr. Murphy) I can try.

I'm just trying to know, other than what you have previously said about your knowledge regarding Hy-Vee's discrimination policy, if you have any other information regarding that policy.

A. No.

Q. Does Hy-Vee have a policy regarding harassment?

A. Yes.

Q. And what is your understanding of that policy?

A. That we do not allow harassment.

Q. And do you have any further understanding of that policy?

Page 26

MS. DeVENEY: Objection. Vague.

A. Other than we don't allow it, that's the answer that I'm giving you.

Q. (By Mr. Murphy) And according to Hy-Vee's policy, how should an employee submit a report of discrimination or harassment?

A. To their direct supervisor or to HR, human resources; to myself; to my store manager. Really, you know, anyone that they're comfortable with in the management team, they can talk to us about.

Q. Does Hy-Vee have a policy regarding the accommodation of an employee's physical impairment?

A. I don't know if there's a policy for that.

Q. What about a policy regarding the accommodation of an employee's mental impairment?

A. We have programs out there to help people with whether there's a -- a mental issue or something. We will assist them to get them help.

Q. Okay. Do you have any more specific information regarding that policy?

MS. DeVENEY: Objection. Vague.

A. No.

Q. (By Mr. Murphy) Is Hy-Vee permitted to instruct an employee to perform job duties that are outside of that employee's work restrictions?

Page 27

MS. DeVENEY: Did you say, "Is Hy-Vee instructed to do that?"

Q. (By Mr. Murphy) Is Hy-Vee permitted to instruct employees to perform job duties that are outside of that employee's work restrictions?

A. No.

Q. What consequences would an employee who instructs a employee with work restrictions to violate work restrictions? In that scenario, what consequences would the employee who is instructing somebody they supervise to break the work restrictions -- what consequences would they have?

MS. DeVENEY: Objection. Overly broad. Vague.

A. It would depend on the situation. But we would -- we -- if there is restrictions -- if an employee brings us restrictions, we work around those restrictions.

Q. (By Mr. Murphy) Right.

But in a scenario that the employee was told to do something that was outside his work restrictions and then that person's manager or another manager finds out, what type of consequences would come down?

MS. DeVENEY: Same objections.

Page 28

A. I would have to have more information on what happened to answer that question.

Q. (By Mr. Murphy) What type of information?

A. What happened. I mean, I'd have to listen to both sides of, you know, the employee -- find out what the restrictions were, find out what actually happened -- and make some decisions from there based on what -- what took place.

Q. Okay. Does Hy-Vee have a policy regarding retaliation?

A. I don't know if there's a policy, but we don't accept it.

Q. What training, if any, have you received at Hy-Vee with respect to discrimination?

MS. DeVENEY: Objection. Asked and answered.

A. There's -- throughout the years there's been several trainings on that, whether it be at a directors meeting where somebody came in and talked about it, whether it be in our Workday, which is training that is ongoing training throughout the years. And a lot of my training as well has just come through experience over the years.

Q. (By Mr. Murphy) When was the last time that you think you would have received any training

Page 29

on that topic?

A. I'm not sure on that.

Q. Does Hy-Vee have a policy regarding the administration of disciplinary action?

A. I need more information on that question.

Q. Sure. What type of additional information do you need for -- to be able to answer that?

A. I don't fully understand the question on what you're looking for.

Q. Does Hy-Vee have any guidelines in policy format that management can refer to in going through the process of issuing disciplinary action?

A. We can look through our employee handbook. It has -- any policies that we would have in place would be in an employee handbook that would talk about many of the things that you're -- you have referenced so far.

Q. And in that handbook, do you know whether there's any sort of specific policy regarding any type of progressive or -- or step disciplinary policy?

A. For the employee or for the management team?

Q. Well, I guess it could be for both. I'm just trying to get your -- your understanding if

Page 30

there is a policy saying, you know, Hy-Vee has a step-by-step or progressive disciplinary policy where there's first some sort of initial disciplinary action, and then it progressively gets more serious. Does that make sense?

A. Yeah. No, we don't -- we don't have a progressive policy like that, to my knowledge.

Q. Does Hy-Vee have a policy regarding theft?

A. Yes.

Q. And what is that policy?

A. Termination.

Q. Do you have any other -- well, strike that.

How do you define the term "theft"?

A. Somebody that takes merchandise out of the store without paying for it.

Q. Okay. Is that your complete definition of that term?

A. Theft can come in -- yeah, that's -- that's pretty much it.

Q. Okay. What about if an employee removes the property of Hy-Vee? Would you consider that theft?

MS. DeVENEY: Objection. Vague.

A. I need more information.

Page 31

Q. (By Mr. Murphy) Okay. So I'll give you a hypothetical. If, when we say store property, that's including, like, let's say, part of the uniform, like an apron, would that constitute store property?

A. That would be -- that would be considered part of their dress code probably.

Q. Okay. But if -- if a employee takes an apron home and does not return it, would you consider that theft?

A. It's Hy-Vee property. So yes.

Q. So I -- I guess with that information, if -- strike that.

Do you have any further understanding of Hy-Vee's policy regarding theft?

MS. DeVENEY: Objection. Vague.

A. I told you what I knew about our policy.

Q. (By Mr. Murphy) Does Hy-Vee have a policy regarding the accidental removal of its property or merchandise?

A. No.

Q. Does Hy-Vee have a policy regarding how investigations are to be conducted?

A. No.

Q. I just want to make sure you understand my

Page 32

question. So let's kind of go through the different types of investigations. So with respect to, like, a complaint of an employee or report of an employee appearing to walk out with store property or -- or merchandise, you know, and not return it, is there any type of policy at Hy-Vee, to your knowledge, regarding how that complaint is supposed to be investigated?

A. I don't know that it's necessarily a policy. I mean, it would have to depend on -- I need more information as far as did someone bring that to my attention, or how I -- how I came about with that information.

Q. So what I'm really trying to -- to ask you is in that scenario when that type of complaint is made that I just referenced, is there, like, a set list of, you know, things that need to be checked off in order to fully investigate that complaint?

A. No.

Q. When did you first become acquainted with or interact with Mr. Stewart?

A. Assuming I would have had an interaction with him when I started working at that store in April of '21.

Q. Do you have any specific recollection of

Page 33

that interaction?

A. No. I mean, I have interaction with all my employees; so the interaction -- a lot of my interaction's just walking departments, seeing how their day is going, seeing what they're up to. I try to do that in all my departments every day.

Q. And do you know what position Mr. Stewart was working in around that time?

A. I believe he would have been a produce clerk.

Q. Were you aware that from a young age Mr. Stewart had suffered from osteomyelitis?

A. No.

Q. Do you know what osteomyelitis is?

A. No.

Q. I'll just go ahead and let you know -- my understanding is that it's a inflammation or swelling of bone tissue that is usually the result of infection.

Were you aware that prior to Mr. Stewart's most recent period of employment at Hy-Vee, he had also been diagnosed with anxiety, depression, and bipolar disorder?

A. No.

Q. Do you know whether Mr. Stewart requested

Page 34

any accommodations for his physical impairment during his most recent period of employment at Hy-Vee?

A. No.

Q. Were you aware that Mr. Stewart had undergone surgery during his most recent period of employment before he was terminated?

A. No.

Q. Let me ask you this: With respect to employees' physical impairments, who were they expected to talk to at Hy-Vee to make Hy-Vee aware of those physical impairments?

MS. DeVENEY: Objection. Form and foundation.

A. Typically they would work with their department manager to accommodate whatever their needs might be.

Q. (By Mr. Murphy) Was there anyone else that they could talk to to try to broach that issue? For example, like HR?

A. Sure.

Q. Were you aware that Mr. Stewart had some of his toes amputated as -- as part of treatment he had been receiving for his osteomyelitis?

A. No.

Page 35

Q. Did you have any involvement in the completion of an employee like Chris Stewart's performance reviews?

A. Typically his department manager would have done his employment review.

Q. Did you have any final approval or anything of that?

A. No.

Q. Was there any other manager that was involved with -- with that performance review?

A. To my knowledge, no.

Q. Was that a annual review?

A. Typically, yes.

Q. Is it your understanding that earlier in 2023, prior to Mr. Stewart's termination, that he had received a performance review of "meets expectations" or "satisfactory" from Hy-Vee?

A. Did I know if he had a review? Is that what you're asking?

Q. Yeah. Do you know whether he -- let me just rephrase the question. You know, I'm sure I've asked -- already asked some bad questions. But, you know, there will probably be a few more along the way. So bear with me.

But is it your understanding that in 2023,

Page 36

before Ms. Stewart was -- Mr. Stewart was terminated in early June 2023, that Mr. Stewart had received a -- basically a positive performance review from Hy-Vee?

A. That very well could have happened. I mean, his -- he did a good job for us. So I'm -- it probably was a "meet expectations" review, I would assume.

Q. And is it your understanding that in early June of 2023 that Hy-Vee terminated Mr. Stewart's employment?

A. Yes.

Q. And, to your knowledge, did he have any prior disciplinary actions issued against him in the twelve months preceding his termination?

A. To my knowledge, no.

Q. And why did Hy-Vee terminate Mr. Stewart's employment?

A. For stealing merchandise.

Q. Any other reason?

A. No.

Q. And did you tell Mr. Stewart why he was being terminated?

A. I did.

Q. And what did you tell him?

Page 37

A. I told him he was terminated for stealing merchandise from our store.

Q. Any other reason you provided to Mr. Stewart for his termination?

A. No.

Q. When you told Mr. Stewart -- Mr. Stewart that, did you say anything else to him?

A. I told him -- at the time that I spoke with him, he said he had paid for the merchandise, and I told him if he could show me proof of the receipts that we will -- we would not terminate him.

Q. Is there anything else you -- you told him at that time?

A. To my knowledge, no.

Q. And do you recall Mr. Stewart saying anything in response?

A. He had told me he could produce the receipts for the merchandise that he had took.

Q. You recall him saying anything else at that time?

A. He told me that he -- he would go home and come back with the receipts to prove that he paid for them. And I told him to go ahead and do that. And he returned to the store with -- with some receipts that didn't match the merchandise he had

Page 38

took, nor did they match any time frame of when he left the store without paying for the merchandise.

Q. And other than what you just said, do you recall either you or Chris -- during that meeting where you told him he was being terminated, do you remember either of you guys saying anything else?

A. I don't believe so.

Q. Was there anyone else that was there?

A. At the time that we terminated him?

Q. Yes.

A. I -- I'm sure there -- I always have a witness with me, and I can't remember who would have been there. Possibly -- more than likely Cate would have probably been there.

Q. Okay. And other than yourself, was there any other Hy-Vee employees who were involved in making the decision to terminate Mr. Stewart?

A. Again, Cate and I would have been there at the termination, but ultimately -- ultimately, it would have been my decision to terminate.

Q. Right. But my question was did anyone -- did anyone else have input in that decision?

A. Alyssa Lewis actually pulled video for me before we terminated him.

Q. So are you saying she had input in the

Page 39

decision?

A. No.

Q. Okay. Was it just you that had the decision to fire Chris?

A. Ultimately my decision, yes.

Q. There was no one else that had any input into that decision?

A. Well, there was input given to me so I can make that decision. So a coworker brought it to my attention that -- that he was possibly stealing. So I don't know what more information you -- you want. I mean, ultimately, it was my decision to do it, but we investigated the situation where there was other people involved for me to come to that determination to terminate him.

Q. I understand what you're saying. I guess my question is more geared towards, you know, was there anyone else that was, you know, recommending termination, other than yourself, of Chris?

A. Well, like I said, I got -- I got the facts, and ultimately my decision to fire him.

Q. Who was the employee that had reported perceived wrongdoing by Chris?

A. I had an Archie Campbell, who worked in my seafood department, saw him picking up merchandise

Page 40

and proceed to the produce trim room. And Archie told me at that point, or at some point, "Hey, it just seemed odd that he took merchandise into the trim room." And that's when I had Alyssa Lewis pull the videotape.

Q. Okay. What the -- what's the trim room?

A. So the trim room is an area just outside the produce cooler where they do a lot of prep work. So that -- when I say "prep work," that could be dicing melon; that could be wrapping product. It's basically prepping produce to go to the selling floor -- is what the trim room is -- is.

Q. And what position was Archie in?

A. He would have been a seafood -- or seafood/meat clerk.

Q. Does he still work there?

A. He does.

Q. When were you first made aware of the allegation of wrongdoing relating to the removal of store property and merchandise against Mr. Stewart?

A. I believe it was a Saturday, possibly June 3rd.

Q. And was this Alyssa that told you?

A. That was Archie.

Q. Archie told you?

Page 41

A. Yes.

Q. How did he tell you? Was it in person? Or was it through some sort of written communication?

A. It was in person.

Q. I just want to make sure we're clear for the record. What exactly do you remember him saying to you?

A. I believe -- it was a while ago, but I believe he approached me in the back room and made the comment that he had seen Chris pick some items up and proceed to the produce cooler in the back room with the merchandise. And at that point when I had heard, that's -- that's when we -- I had asked Alyssa Lewis to pull -- I don't know if I did it Saturday or Monday, but I had asked to see videotape so that we could see, actually, what was going on with the merchandise that he had picked up out of the back room.

Q. And whenever you received that report from Archie, do you remember what you did right after that?

A. Alyssa? Or is that who you're referring to.

Q. No. What you did when you talked to

Page 42

Archie.

A. So I discussed it with Archie. And, like I mentioned, I -- I believe that I asked Alyssa Lewis to pull videotape so that we could see where the merchandise -- what was going on with the merchandise.

Q. And did she pull the video?

A. Yes.

Q. Okay. Then what happened?

A. So I watched the video from him picking the merchandise up, going into the produce cooler, and I continued to watch video -- parts of the video where he exits the trim room with the merchandise in a grocery bag, which was a huge red flag. Because number one, I don't know why we would have grocery bags in the produce trim room. There would be no reason to have grocery bags in that trim room.

And I watched the video where he comes out of the trim room with the merchandise bagged and proceeded to go into the restroom. Or I know he was at the restroom at some point during that video. And then I watched him proceed to go through the self-checkouts without paying for the merchandise, bagged up, and walked through the self-checkout and out the front doors.

Page 43

Q. Okay. And this video you're referring to you no longer exists; correct?

A. Correct.

Q. Okay. And when was it destroyed or deleted?

A. So the video -- the video is an ongoing loop. So I don't know how long corporate keeps them. I'm guessing they keep that video probably 30 days maybe. And then -- so the video was destroyed, but we do have -- I had a file saved to where we had "clippets" of the video -- of him with the merchandise bagged with him going out the front door.

Q. Right. We'll -- we'll get to that. But I just want to know, as far as the video, a few more things here. So you said Alyssa is the one that pulled the video?

A. Yes.

Q. Okay. And so when she pulled the video, do you know where she saved it?

A. I don't know that we -- I don't know that she actually saved the video. If she did, it would have been in one of her files on her computer.

Q. What was the -- the normal practice of whenever someone -- a manager was pulling video?

Page 44

What was it -- what was the general practice as far as that goes?

A. Typically we don't save any video, or we'll investigate a video, but if it showed no evidence, we would do nothing with it at that point.

Q. Even when an employee is terminated, the general practice is not to save the video somewhere?

A. Again, I don't know if the video was saved or if it was not saved. Typically if somebody is terminated, we want to keep as much evidence as we can. In case it does go to unemployment or something like that, then we can reference that -- those videos or -- or photographs.

Q. Is it fair to say that this video footage that at one point existed was used against Mr. Stewart?

A. Yes.

MS. DeVENEY: Object to the form of the question.

Q. (By Mr. Murphy) Just want to -- I think you answered that. Just want to make sure. Was that "Yes"?

A. Yeah. I mean, it was part of my investigation in his termination.

Q. And is it your understanding that

Page 45

Mr. Stewart filed a claim for unemployment compensation benefits with the State of Missouri shortly following his termination?

A. I don't know when he did. I assumed he would.

Q. And is it your understanding that Hy-Vee fought that claim?

A. Yes.

Q. And in Hy-Vee's opposition of that claim, did it submit that video to the State of Missouri?

A. I cannot answer that.

Q. Who would be able to answer that?

A. Cate.

Q. Is it accurate to state that this video existed at the time that Mr. Stewart filed his claim for unemployment benefits?

MS. DeVENEY: Objection. Foundation.

A. I can't answer that. Again, I don't know -- I don't know how long those videos are saved. It's not done at store level.

Q. (By Mr. Murphy) I'm assuming you've probably participated in more than one unemployment hearing throughout your tenure at the St. Joe store as the store director?

A. Most of the unemployment hearings, I do

Page 46

not attend. It's usually done by my HR manager.

Q. Have you attended them before?

A. Yes.

Q. Do you recall whether you attended the one for Chris Stewart?

A. I did not.

Q. Do you know who did?

A. Cate Riddle.

Q. Anyone else?

A. To my knowledge, no.

Q. Other than what you've told me previously about the videos and the practices towards, you know, preserving them or not preserving them, do you know why Hy-Vee didn't take steps to ensure that this video was preserved?

MS. DeVENEY: Objection. Form and foundation.

A. Do -- do I know why it wasn't?

Q. (By Mr. Murphy) Do you know why Hy-Vee did not take steps to ensure that this video that was used to terminate Chris Stewart was not [sic] preserved?

MS. DeVENEY: Same objections.

A. No.

MR. MURPHY: Let's go off the record.

Page 47

We've been going about an hour. So take about a five-minute break.

MS. DeVENEY: Okay.

(A recess was taken.)

Q. (By Mr. Murphy) All right. Mr. Dolph, we are back on the record.

Do you know what time of day that you had called Mr. Stewart into your office whenever you had a meeting with him about termination?

A. I don't recall a time.

Q. And was the specific allegation against Mr. Stewart that he stole three small or snack-size bags of chips?

A. Yes.

Q. Okay. And were those chips from the discount rack?

A. Yes.

Q. Okay. So what is your understanding of how much each of those bags of chips would have been?

A. At the time, I didn't know what the value was on those chips.

Q. Do you know now?

A. I believe they -- I believe they were 50 cents each.

Page 48

Q. Okay. So then for three of them, would have been, like, $1.50, $1.20, something around there?

A. Yes.

Q. So, basically, you were telling Mr. Stewart that he'd been fired for taking about $1.50 of merchandise --

MS. DeVENEY: Objection. Form of the question.

Q. (By Mr. Murphy) -- correct?

A. I informed Mr. Stewart that he was stealing. It had nothing to do with the dollar amount.

Q. Okay. Was Mr. Stewart escorted out of the store on that initial -- right after that initial meeting you had with him where you informed him that he was being let go?

A. I don't recall if he was or was not.

Q. Was that something that was typically done?

A. Yes.

Q. Who was in charge of the escorting?

A. At that time, it could have been -- at that time, we did have security in the store; so it could have been a security officer.

Page 49

Q. And I believe you mentioned this a little bit. But your recollection is that Mr. Stewart had returned to the store in an effort to plea to be reinstated to his job; right?

A. He was supposed to bring back proof of purchase receipts.

Q. Did that include, like, bank statements too?

A. I -- I don't recall if he brought bank statements in. I know that he said that he could bring bank statements in.

Q. Do you recall if he did bring receipts in?

A. He did bring receipts in.

Q. Do you know whether it was a bank statement or an actual receipt?

A. I'm pretty sure he had actual receipts, and I don't -- I can't recall on the bank statement.

Q. Did he ever say anything -- Mr. Stewart -- when he came back about, you know, "In the event if I did take anything, you know, it was an accident; and, you know, here's $5"? Did he ever say anything like that?

A. No.

Q. Okay. Did you ever ask him anything like "Okay. Well, give" -- "give us $1.50"?

Page 50

A. No. My response was I just wanted proof that he had paid for the merchandise.

Q. Would you agree that one of the following scenarios has to be true in this case? That, one, Mr. Stewart intentionally stole the three snack-size bags of chips worth about $1.50. Or Mr. Stewart accidentally walked out of the store without paying for the three snack-size bags of chips worth about $1.50?

A. Mr. Stewart left the store without paying for merchandise.

Q. But the question was would you agree that -- one of those two scenarios has to be true; right?

A. Yes.

Q. Okay. And did Hy-Vee ever have an issue with Mr. Stewart not paying for items or allegedly stealing items before that?

A. To my knowledge, no.

Q. And is it your understanding that Mr. Stewart had just recently bought items that were more expensive than the about $1.50 altogether three snack-size bags of chips prior to this?

A. I don't know what he purchased prior to that, no.

Page 51

Q. Okay. I mean, I'll just represent to you that around this time of this -- this whole, you know, reason for the termination as far as Hy-Vee is -- their position, that Mr. Stewart bought other items that were more expensive than the $1.50 bag of chips. Okay?

So do you know -- strike that.

I'll also ask you this question: Is it fair to say that Mr. Stewart as well as you and other employees that worked there realized that there were cameras all over the store?

A. Yes.

Q. Okay. So taking all of those circumstances into consideration, how is it that Hy-Vee arrived at the conclusion that Mr. Stewart had intended to steal three snack-size bag of chips worth approximately $1.50?

MS. DeVENEY: Objection. Form of the question.

A. Mr. Stewart took the merchandise, bagged it up, proceeded through the front end without paying for his merchandise.

Q. (By Mr. Murphy) Right.

And that -- so that was not -- didn't answer the question. So based on what I've just

Page 52

told you, that Mr. Stewart has made numerous purchases at the store and there's videos all over, why did Hy-Vee jump to the conclusion that Mr. Stewart had intended to steal three small bags of chips?

MS. DeVENEY: Objection. Form of the question. And asked and answered.

A. We didn't jump to conclusions.

Q. (By Mr. Murphy) Well, you said this was -- the conduct that was alleged against Mr. Stewart happened a day or two before his termination; correct?

A. Yes.

Q. Okay. And so as you already testified, the process was Archie reported Chris to you; right?

A. Yes.

Q. And then you had Alyssa pull the video; right?

A. Yes.

Q. And then Mr. Stewart was terminated; right?

A. Yes.

Q. Okay. And you said you don't know whether Ms. Lewis saved the video?

A. To my knowledge, she didn't.

Page 53

Q. Okay. Why do you say that?

A. There would be no reason to actually save it.

Q. Did you ask her whether she saved it?

A. I don't recall.

Q. Did she tell you that she didn't save it?

A. I don't recall.

Q. And if she's pulling the video, would at some point that video be on her personal computer at the office?

MS. DeVENEY: Objection. Form and foundation.

Q. (By Mr. Murphy) At the store. Sorry.

A. The video itself?

Q. Right.

A. No.

Q. You're asking her to pull the video. Where would she place that video?

MS. DeVENEY: Objection. Form of the question.

A. So she doesn't save the video. She would have got pictures from the video.

Q. (By Mr. Murphy) You watched the video; right?

A. Yes.

Page 54

Q. And you watched it in your office; right?

A. I don't recall where I watched it.

Q. Did you watch it with Chris Stewart at all when he was in your office?

A. I don't believe so.

Q. What are the elements of stealing?

MS. DeVENEY: Objection. Form of the question.

A. Can you rephrase that.

Q. (By Mr. Murphy) What -- I'm not sure that I can rephrase it.

What are the components of stealing?

A. Taking merchandise from the store without paying.

Q. Okay. And would you agree that intent is an element of stealing?

A. Yes.

Q. What evidence do you have that Chris intended to steal the chips?

A. Chris took merchandise, put it in a bag, proceeded out the front door past all check lanes, where he had every chance to pay and did not.

Q. Okay. Do you have any other evidence or purported evidence of intent?

A. I don't believe so.

Page 55

Q. Does Hy-Vee have any other evidence of intent?

A. No. Other than he took the merchandise.

Q. And, again, this is the video that Hy-Vee did not retain; correct?

A. Correct.

Q. We don't have the ability to pull up that video on one of these TVs and me ask you questions about it; right?

A. No. Because it's an ongoing loop, like I mentioned.

Q. Okay. But you asked Alyssa to save -- you asked her to pull the video; right? And then you used that video to terminate Chris Stewart; right?

A. It was part of the evidence, yes.

Q. Well, there wasn't any other evidence. What -- you just said there wasn't any other evidence besides the video; right?

A. Archie seen him take product into the trim room which ...

Q. Did you take a written statement from Archie?

A. I don't believe so.

Q. So there's no other evidence besides the video that was used to terminate Chris's employment?

Page 56

MS. DeVENEY: Objection. Form of the question. Argumentative. Asked and answered.

A. I go back to my -- the fact that I had proof that Chris took merchandise without paying.

Q. (By Mr. Murphy) That's fine. But there's no other evidence that was used to terminate Chris's employment except for the video; correct?

MS. DeVENEY: Objection. Asked and answered.

A. The -- again, the video was part of the investigation that got Mr. Stewart fired.

Q. (By Mr. Murphy) Okay. And are you aware of any other evidence, specifically, that was used to terminate Chris Stewart for stealing?

MS. DeVENEY: Same objection.

A. No.

Q. (By Mr. Murphy) Are you aware of any other employees other than Chris Stewart that you terminated at the St. Joe Hy-Vee store in 2023?

A. Oh, I'm sure there has been. I mean, I deal with hundreds of employees every day. I can't give you a specific name.

Q. I mean, have you -- let's just say in the past month. Are you aware of any specific employees that you have had to fire?

Page 57

A. No.

Q. What about the past quarter?

A. I don't believe so.

Q. How about the past six months?

A. Actually, last quarter I did fire somebody for stealing money.

Q. How much money was it?

A. I've had -- I had one that was over $200. I've had one that was much less than that. But when it comes to termination, anybody that steals from me gets terminated.

Q. As far as the -- the most recent incident you were talking about, how much money did the person steal?

A. I think it was somewhere around 200.

Q. You said they stole cash?

A. Yes.

Q. Like, out of a register?

A. Yes.

Q. Do you know the name of that employee?

A. I don't recall. They had only worked for us for three or four days.

Q. Do you recall specifically any other employees that you fired at the St. Joe store within the past few years for stealing or theft?

Page 58

MS. DeVENEY: Did you say does he know names?

Q. (By Mr. Murphy) Do you know of anyone other than the person you just talked about and --

A. That I haven't fired. But I know there -- I'm sure there has been. Cate deals with most of our terminations unless it's full time.

Q. But as far as you personally, you don't know of anyone else other than those two?

A. I don't recall any more than that, no.

Q. Okay. Okay. Based on your personal experiences as the store director at the St. Joe Hy-Vee, was there ever an occasion where you noticed an employee take store property or merchandise home and not return it?

A. No.

Q. And store property includes any, you know, items including hats, aprons, silverware, napkins, pens, notepads, et cetera?

A. Yes.

Q. So you have seen that?

A. Oh, no, I have not seen that.

Q. Okay. You can't even think of an instance where an employee has taken an apron home and not returned it?

Page 59

A. No.

Q. Was there ever an instance where an employee intentionally or accidentally took store property or merchandise out of the store without paying for it? Obviously, excluding -- other than with Chris we've talked about.

MS. DeVENEY: Objection. Form and foundation.

A. Can you ask the question again, please.

Q. (By Mr. Murphy) Sure. Outside of what we have discussed with Chris, was there ever an instance where an employee intentionally or accidentally took store property or merchandise out of the store without paying for it?

MS. DeVENEY: Objection. Foundation.

A. I'm sure there has. And I'm -- at some point probably. I don't know. I don't know what you're -- what you're trying to get to.

Q. (By Mr. Murphy) How much does an apron cost? Do you know?

A. Couldn't tell you.

Q. Would you assume probably more than $1.50?

A. I would assume.

Q. Do you recall an employee ever being terminated for taking store property like a hat or

Page 60

apron or pen or notepad or anything like that home?

A. No.

Q. And, obviously, not returning it?

A. No.

Q. Was Barry Stewart off of work whenever Chris was terminated?

A. I don't believe so.

Q. Do you know whether he was on vacation whenever Chris was terminated?

A. I couldn't -- I don't remember. I don't believe so.

Q. Why do you say that?

A. Because I know after the termination of -- of Chris, I spoke to Barry about the termination because I wanted him to -- with it being his brother, I wanted to deal with Barry. I wanted him to hear the information that took place from me and not through a rumor mill or somebody else.

Q. Do you remember whether that conversation was in person or over the phone?

A. In person.

Q. At the Hy-Vee store or where?

A. My office, yes.

Q. And when was that?

A. It would have been directly after we

Page 61

terminated him.

Q. So you're saying that same day?

A. Yes.

Q. Have you ever accidentally taking -- taken an item from the store home like -- like we just mentioned, like a notepad or a pen or something like that?

A. I don't recall doing that, no. I typically -- I don't -- my pens and stuff, I buy all my own stuff.

Q. Okay. Was there anything else as far as something that was store property that you ever accidentally took home?

A. No.

Q. Do you know whether there has been any employees that have filed a charge of discrimination against the St. Joseph Hy-Vee in the past five years?

A. No.

Q. I'm going to assume you're saying, yes, you know, and, no, there hasn't been?

A. To my knowledge, there has not been.

Q. Okay. Has there been any employees that have made any type of internal complaint of discrimination over that same time frame?

Page 62

A. No.

(Exhibit Number 1 was marked for identification.)

Q. (By Mr. Murphy) Now handing you what has been marked as Exhibit 1.

A. Okay.

MS. DeVENEY: Thank you.

Q. (By Mr. Murphy) This is plaintiff's "Petition for Damages" in this lawsuit. Have you ever seen this petition before?

A. Yes.

Q. And when did you first review it?

A. I don't recall.

Q. And did you review the whole thing?

A. I read through it, yes.

Q. I'm going to go to the next exhibit. We may refer back to this.

A. Okay.

(Exhibit Number 2 was marked for identification.)

Q. (By Mr. Murphy) Now going to hand you what I have marked as Exhibit 2.

A. Thank you.

Q. I believe you testified earlier that you have reviewed these interrogatory answers prior to

Page 63

today's deposition?

A. Yes.

Q. And were you the employee for Hy-Vee that signed the verification for this?

A. Yes.

Q. With respect to Interrogatory 2, where it says, "Identify by name, job title, last-known home address, and last-known telephone number each person known or believed by defendant to have knowledge of facts alleged in plaintiff's petition or defendant's answer."

As you'll see in Hy-Vee's answer there, there is an incomplete response. So with respect to your understanding, who are all of the individuals who have knowledge of facts alleged in plaintiff's petition or defendant's answers?

MS. DeVENEY: Objection. Form and foundation.

A. I don't know.

Q. (By Mr. Murphy) In other words, who do you believe are the witnesses with knowledge of the facts surrounding this case?

A. Cate Riddle. Other than that, I'm not sure who -- I don't think there is anyone, probably.

Q. You're obviously a witness; right?

Page 64

A. Yeah.

Q. And then Chris is obviously a witness?

A. Yes.

Q. And the folks you talked about previously would be witnesses; correct?

MS. DeVENEY: Objection. Vague.

A. Everyone you mentioned -- there's a chance that they would not know that there's a lawsuit. They would just know about his termination.

Q. (By Mr. Murphy) And I -- so the question is just more geared toward making sure we, you know, are able to discover all of the witnesses on the case. Right?

So outside of people that we've already talked about, is there anyone else that we haven't talked about that you think would be helpful to talk to in order to basically get -- gather all of the information surrounding this case?

A. I can't think of anyone, no.

Q. Flip to 5. And I mean Interrogatory 5.

A. Not page 5?

Q. Right. It's on page 3.

A. Okay. Yeah. Got it.

Q. So this question is asking about meetings that were held involving plaintiff. Outside of the

Page 65

meetings that are listed in this answer, are you aware of any other meetings?

A. No.

Q. Let's go to Number 7. So what type of email did you and other managers use at Hy-Vee to communicate?

MS. DeVENEY: Objection. Vague.

Q. (By Mr. Murphy) For example, did you use Gmail? Or did you use Outlook? Something else?

A. We use Outlook just to communicate with each other on the Hy-Vee computers.

Q. Okay. And with Outlook, I believe it's got its own instant messaging platform. Did you personally ever utilize that? I believe it's called "conversations."

A. Oh. Oh.

Q. They all have their own names but ...

A. Are you asking have I used it in regards to this case? Or do I use it ...

Q. Well, I mean, just do you ever use any type of instant messaging for work purposes at Hy-Vee?

A. Email. Text messaging.

Q. Right.

But, like, just want to be -- try to be as

Page 66

clear as I can. When I'm saying "instant messaging," there's, like -- most email platforms have within themselves a separate feature to where you can literally have, like, an ongoing immediate conversation. Does that make sense?

A. Yes.

Q. Did you ever use anything like that through Outlook or through Slack or Teams or anything else to communicate with your coworkers at Hy-Vee?

A. Just email.

Q. Okay. Did you ever -- did you ever have a work phone that you used to communicate with other employees at Hy-Vee?

A. I use my personal cell phone to communicate with them by text.

Q. And did you not have, like, a work phone at all?

A. No.

Q. Did you ever text any of the other managers regarding any of the facts or allegations in this case? Like for -- for -- an example is surrounding the time where his report came about from Archie, do you recall sending or receiving text messages about that to any other managers?

Page 67

A. No.

Q. What is Heymarket?

(Reporter clarification.)

A. I don't know. I am not a technology guy at all. I'm a -- I can get on email, and that's about it. So I don't know.

Q. (By Mr. Murphy) Okay.

A. I don't recall what it is.

Q. Got you.

(Exhibit Number 3 was marked for identification.)

Q. (By Mr. Murphy) I'm handing you what's been marked as Exhibit 3.

A. Thank you.

Q. And I'm not going to go through each one of these pages in here.

A. Okay.

Q. So I've just got some general questions for you. Earlier we discussed, briefly, Mr. Stewart's unemployment compensation benefits claim; correct?

A. Yes.

Q. And I just want to make sure. Outside of what may have been already discussed, is there any involvement that you had with respect to that claim

Page 68

as far as Hy-Vee's --

A. No. No. My -- Cate, my HR manager, typically takes care of all the unemployment things.

Q. You said "Cade"?

A. Cate.

Q. Cate.

A. Yeah.

Q. There was a Cade, and there was a Cate.

A. Yeah. Yeah.

(Exhibit Number 4 was marked for identification.)

Q. (By Mr. Murphy) Handing you what I just marked as Exhibit 4. This is a -- can you read what it says there at the top?

A. I can tell you it's our termination form.

Q. And did you complete this form, or did somebody else?

A. Cate -- looks like Cate filled it out and I signed it along with Chris.

Q. It says the termination date was June 5th, 2023; right?

A. Correct.

Q. And in the middle there, what does that say? Like, as far as the title of that section, can you see?

Page 69

A. It's really -- no, I can't read what it says.

Q. Is that --

A. "Reason for separation" possibly.

Q. Okay. And it says, "Conduct unbecoming Hy-Vee employee"; correct?

A. Yes.

Q. And was that part written by Cate?

A. Yes.

Q. Do you have anything else to add about this termination notice?

MS. DeVENEY: Objection. Form of the question.

A. No.

Q. (By Mr. Murphy) I want to make sure that I'm clear on something that's on the page. Do you see where it says, "This is the sole and exclusive reason for my separation"?

A. Yes.

Q. Do you know what -- what that's pertaining to?

A. So when we terminate somebody, they're able to read through the termination form, and then they're asked to sign it. And that's what -- that's what happened here.

Page 70

Q. Is this just part of the form, though?

A. Yes.

(Exhibit Number 5 was marked for identification.)

Q. (By Mr. Murphy) I'm handing you what's marked as Exhibit 5. Do you recall receiving this email from Chris?

A. I do.

Q. And that was on June 6th, 2023?

A. Correct.

Q. Do you recall sending Chris any sort of response?

A. I don't recall. I don't believe I did.

Q. Do you recall doing anything in response to this email?

A. No.

Q. You just read it and tucked it away?

A. I read it, yeah. That's what I did.

Q. And is it fair to say that Chris was basically telling you, "I really need my job back," and he'll -- you know, if -- if it turned out that he had done something that he didn't think he did as far as taking something without paying, then, you know, he was going to try to make it right. Is that your understanding of what the gist of his message

Page 71

was?

A. Yes.

Q. Do you know why you didn't entertain trying to basically give him the benefit of the doubt here to try to reinstate him?

MS. DeVENEY: Objection. Form of the question.

A. When somebody steals from me, there's usually not a second chance. There's not a second chance when you steal.

(Exhibit Number 6 was marked for identification.)

Q. (By Mr. Murphy) Handing you Exhibit 6. Do you recall this email?

A. Yes.

Q. It says that "We have both been called as witnesses in the unemployment hearing for Chris Stewart on Monday, September 11th, at 9:00 a.m." Do you see that?

A. I do.

Q. And it says, "Are you available? Or would you like to be unavailable?" Do you see that?

A. I do.

Q. So do you recall responding to this email?

A. No.

Page 72

Q. Do you know why it says, "Would you like to be unavailable?"

A. I do not other than the fact that, with unemployment hearings, Cate does 99.9 percent of them.

Q. And this is from "St. Joseph - HR Manager"; right?

A. Yes.

Q. Is that just the specific email for Cate, or is that, like, a group email?

A. No. That's specifically to Cate.

Q. Okay. And it looks like Tina Evans was copied on that?

A. Yes.

Q. How frequently did you use email like on a daily basis around this time of mid 2023?

A. How frequently?

Q. Uh-huh.

A. Daily.

Q. Well, like, I mean, approximately, like, how many emails would you be sending on a daily basis?

A. I don't send a lot of them. I mean, I probably send less than probably five or ten a day. I receive probably several hundred a day.

Page 73

Q. Okay. Have you reviewed your own email to see if there's any other emails that relate to Chris Stewart at all?

A. I don't believe there are any others related to him --

Q. Have you --

A. -- that I haven't reviewed.

Q. But have you looked through your email to see if there were any?

A. Well, I check my email several times throughout the day; so if I -- if I would have received something in regards to him, I would have either responded or went and talked to Cate or whoever was involved with that email, if there was one.

Q. Okay. The question was more along the lines of have you ever -- after this lawsuit has been filed, have you ever gone through your email to see if there's any emails that are pertaining to Chris Stewart or, basically, the topics we've been discussing today?

A. No. I mean, like I say, I -- I check my email several -- several times throughout the day and evening, for that matter. But I haven't gone back and reviewed anything else.

Page 74

Q. Have you gone back and looked through any of your text messages to see if you have any text messages relating to Chris Stewart or this case?

A. There is no text messages.

Q. Have you looked, though, to see if there might be?

A. There's not.

Q. Have you looked?

A. Sure.

Q. You have looked?

A. I -- I'm on my phone just as much as I am my email.

Q. But my question was have you, like, gone through and looked at, like, your messages with the -- some of the other managers that we've talked about today to see if there was any messages that you'd either received or sent that were regarding the allegations in this case?

A. There's no text messages that -- I typically either talk in person or by email. I do very little text messaging. And especially in situations like this, it's usually face-to-face or by email.

Q. And I understand that's your position, but have you gone and looked to confirm that?

Page 75

A. As I told you, I checked my text messages several times throughout the day. So if there was anything related to Chris, I would have seen it. And I told you that there was not.

Q. And since this lawsuit was filed, you've gone and looked back at your messages to confirm that there's not any messages pertaining to this case?

A. Yes.

(Exhibit Number 7 was marked for identification.)

Q. (By Mr. Murphy) There's the exhibit, sir.

MS. DeVENEY: Thank you.

Q. (By Mr. Murphy) What are we looking at here, Exhibit 7?

A. Separation information.

(Reporter clarification.)

THE WITNESS: Oh, I'm sorry. I was just reading through this to see what it was.

A. I'm assuming this probably had something to do with the unemployment hearing.

Q. (By Mr. Murphy) Why do you say that?

A. Because this is something that either -- that I have not filled out. So I'm assuming either Cate filled it out for unemployment or she has to do

Page 76

something with this when she terms an employee. But I'm not familiar with it.

Q. Have you ever seen this document prior to today?

A. I don't believe so.

Q. I'm going to refer you back to the exhibit of the unemployment claim. I think it was maybe 2 or 3, the really big document. And, specifically, I'm going to refer you to the document that's Bates-numbered MODOL 32. And when I say "Bates number," I'm just talking about the number that's in the bottom right-hand corner --

A. Okay.

Q. -- of the document. Basically, it's page 32 that I'm looking at. And do you see where it says, "Initial claim, 6/18/2023"?

A. No.

Q. It's kind of in the middle.

A. Oh, yeah.

Q. Okay. And I believe we talked about the date of the termination of Chris being June the 5th, 2023; right?

A. Yes.

Q. So this claim -- unemployment claim that was filed by Chris Stewart would have been within 30

Page 77

days of his termination on June 5th, 2023; correct?
A. Correct.
(Exhibit Number 8 was marked for identification)
Q. (By Mr. Murphy) Handing you another exhibit.
A. Thank you.
Q. Just handed you what's been marked as Exhibit 8. What are these policies that we are looking at?
A. Looks like it's just an introduction to Hy-Vee and has -- lists several company policies, attached.
Q. When was the last time that you reviewed these specific policies?
A. I can't recall.
Q. Now, these policies are different than the employee handbook for Hy-Vee; correct?
MS. DeVENEY: Objection. Form of the question.
A. Did you --
Q. (By Mr. Murphy) Let me just ask a different way.
Are -- what other knowledge, if any, do you have about these specific policies?

Page 78

MS. DeVENEY: Objection. Vague.
Go ahead.
A. Ask the question again.
Q. (By Mr. Murphy) What other knowledge, if any, do you have of the policies in Exhibit 8?
MS. DeVENEY: Same objection.
Like, you want him to go through each policy?
MR. MURPHY: No. Just asking what kind of knowledge do you have.
MS. DeVENEY: All right. I'll object to the form of the question.
Take your time if you want to look through them.
Q. (By Mr. Murphy) Are these policies that are handed out at orientation? I mean, I just -- I'm trying to figure out when you would refer to these policies, if at all.
MS. DeVENEY: Objection. Form of the question.
A. These would be involved in orientation.
Q. (By Mr. Murphy) Okay.
(Exhibit Number 9 was marked for identification.)
Q. (By Mr. Murphy) Handing you Exhibit 9.

Page 79

This is the employee handbook for Hy-Vee; correct?
A. Correct.
Q. And when is the last time that you recall reviewing the employee handbook?
A. I can't recall.
Q. And looking at the last page, Hy-Vee 99.
A. Okay.
Q. Do you see towards the bottom under the logo where it says, "June 2019"?
A. Yes.
Q. Is -- is that the last time when this employee handbook was updated?
A. I can't recall.
Q. When is the last time that you had any training on any of the policies in this handbook?
A. It's ongoing. I mean, it's -- we -- I can't recall specific dates. But we talk about it at our director meetings that we have in Des Moines. But I can't give you specific dates.
Q. How often are the director meetings?
A. Typically, minimum, once a quarter.
Q. And what, with respect to the handbook, do you discuss at those meetings?
A. It could be a wide range of topics, just what -- what corporate HR presents at the meeting.

Page 80

Could be time and attendance. It could be different policies. It could be vacation changes. There's numerous things that they could talk about.
Q. Do you know how often, or if at all, employees are expected or given the opportunity to go through training on policies in the handbook other than at orientation?
A. That would be more a -- more of an HR question. But any time there's a policy change, our -- all of our employees are made aware of it.
Q. How?
A. If there's a -- if the handbook is updated, they typically get a copy that -- that they would sign off on. Or they would have -- we would have meetings with employees of any changes. Just like, if there's any insurance changes or changes to vacation, there would be in-store meetings for that type of thing.
(Exhibit Number 10 was marked for identification.)
MS. DeVENEY: Thank you.
Q. (By Mr. Murphy) Handing you Exhibit 10. Have you ever seen this letter before?
A. I don't believe so, no.
Q. Do you know anything about Chris's

Page 81

treatment referred to in this letter?

A. I do not.

(Exhibit Number 11 was marked for identification.)

Q. (By Mr. Murphy) Handing you Exhibit 11. Would you agree this is a employee performance review for Christopher Stewart that is dated February 27, 2022?

A. Yes.

Q. And did you sign that?

A. I don't believe so.

Q. Do you know who would have written your name in?

A. No.

Q. You dispute that that's your signature? Or is that your signature?

A. That's -- I -- it doesn't look like my signa- -- I don't print typically.

Q. Okay. Do you have any reason to believe that anyone other than you wrote your name in there?

A. I don't know.

Q. Let's go through this a little bit more. So we see what appears to be Chris Stewart's signature by "Employee Signature"?

A. Yes.

Page 82

Q. And then it's under that -- says, "Store Director," someone wrote in "Rod Dolph"; right?

A. Yes.

Q. And then there's "Reviewer," and somebody wrote in "Barry Stewart"; right?

A. Yes.

Q. And would you agree that based on the numbers next to the seven different categories of performance that the ratings for Mr. Stewart are all meets or exceeds expectations?

A. Yes.

Q. And that's basically consistent with what you had already told me previously; right?

A. Yes.

(Exhibit Number 12 was marked for identification.)

Q. (By Mr. Murphy) Now I'm going to hand you Exhibit 12. Are these screenshots from the video of Mr. Stewart?

A. Looks to be.

Q. So who had taken these screenshots of this video?

A. I'm assuming Alyssa.

Q. Do you know one way or the other?

A. I would say Alyssa did.

Page 83

Q. So you're saying that without -- I'm trying to know -- did she tell you she did that, or you're just assuming?

A. She did all the camera work on it; so I'm assuming that -- that she did it.

Q. Okay. So let's go through these screenshots a little bit. So the first one here -- that is Chris Stewart walking with some bags of chips in his hand and a drink; right?

A. Correct.

Q. What area of the store is he in?

A. He would be on the south side of the back room, where we keep -- off the selling floor.

Q. And where would the -- the chips have been located that he picked up?

A. So directly to his right shoulder, there is a wooden rack there, it looks like, with two or three shelves on it. That's where those products would have been at that he picked up.

Q. Okay. And looking at the second screenshot -- so it appears to be somebody turned with his back --

A. Chris.

Q. -- carrying a bag?

A. Yeah.

Page 84

Q. Well, you can't see his face. Will you agree with that?

A. It's not his face, but that's Chris.

Q. And would you agree there's no date or time stamp on any of these screenshots?

A. Yes.

Q. What area of the store is the person in the second screenshot standing by?

A. So he is coming out of the produce trim room that we've discussed and making a left turn into the -- more than likely the men's restroom.

Q. What else is back there that way?

A. The ladies' restroom is back there. There's a mothers' room for new mothers to the right in that hallway. And if -- if you would continue to go straight in that hallway, you would have access into the kitchen area of the store -- deli and kitchen area of the store.

Q. Okay. And then looking at the third screenshot, that is a screenshot of -- apparently, Mr. Stewart is standing in, like, some area of the store. Where is that?

A. He's exiting the south entrance in this photo.

Q. Well, he's -- he's standing in front of

Page 85

some bakery items.  Would you agree?

A.  To me, it looks like he's walking.

Q.  You think he's walking?  He's standing there in this picture.

MS. DeVENEY:  Objection.  Form of the question.

A.  I don't know why you would just stand in an entrance.  I mean, his feet look like they're moving, especially his left one.

Q.  (By Mr. Murphy)  Okay.

A.  It's not -- he's not --

Q.  Well --

A.  -- permanent --

Q.  -- we wouldn't know because we --

(Reporter clarification.)

Q.  (By Mr. Murphy)  Go ahead.

A.  If you were standing, you would typically be flat-footed.  You wouldn't have one toe in the air.

Q.  Would you agree that it would be pretty easy to tell what was going on if we could watch the video?

A.  Yes.

Q.  And we don't have that; right?

A.  We've already had that discussion.  No.

Page 86

Q.  And that's the only thing that would prove without a doubt that Mr. Stewart picked up the chips and then walked out of the store without paying for them; correct?

MS. DeVENEY:  Object -- objection.  Form of the question.

A.  We know he did not pay for the chips.

Q.  (By Mr. Murphy)  Okay.  The question was:  The only thing that would tell us without a doubt whether Mr. Stewart picked up the chips and walked out of the store without paying for them is the video that we no longer have?

MS. DeVENEY:  Same objection.

A.  Or we could look up his receipt if we -- if he had paid.

Q.  (By Mr. Murphy)  But that is not answering the question.  The question is:  The only thing that we could look out -- we could look at that would show unequivocally whether Mr. Stewart picked up the chips and then walked out of the store without paying for them is the video that no longer exists; right?

MS. DeVENEY:  Object -- objection.  That misstates his testimony.  Form of the question.  Asked and answered.

Page 87

A.  I gave you the answer.

MS. DeVENEY:  Whenever you're at a stopping point, I think we've been going quite a while.

MR. MURPHY:  Yeah, we can actually take a break right now.  That's fine.

(A recess was taken.)

(Exhibit Number 13 was marked for identification.)

Q.  (By Mr. Murphy)  Now I'm going to hand you Exhibit 13.

A.  Okay.

Q.  Have you ever seen this exhibit before?

A.  I have a hard time reading it.  Looks like transactions from the register.

Q.  Okay.  Have you ever reviewed this specific spreadsheet of transactions before?

A.  No.

Q.  Do you know who would have been in charge of producing something like this?

A.  It could have been -- if they're transactions off the register, it could have been Alyssa, Tina, my accounting coordinator, corporate.  I mean, I don't -- yeah.  I'm not sure where this came from.

Page 88

Q.  How does the register transactions get converted to, like, a spreadsheet?  Does, like -- is there some way of -- like, a software program, like, automatically generates it?  Or do you know?

A.  I don't know.  That would be done at the corporate level.

(Exhibit Number 14 was marked for identification.)

Q.  (By Mr. Murphy)  Now I'm going to hand you Exhibit 19 [sic].

MS. DeVENEY:  Thank you.

Q.  (By Mr. Murphy)  Is this basically a copy of the, like, actual personnel folder or file for Chris?

A.  I don't know.  Looks like some -- it looks like his employment dates may -- or looks like his term date for sure.  These are notes of some sort that looks like Cate, maybe, wrote.

Q.  I was just going to ask you.  Those aren't your notes?

A.  No.

Q.  Okay.

(Exhibit Number 15 was marked for identification.)

Q.  (By Mr. Murphy)  Handing you Exhibit 15.

Page 89

What is your understanding of the documents we're looking at in this exhibit?

A. Looks like something out of his personnel file that shows his positions that he's held within the store while employed at Hy-Vee. And some schedules on some of these back pages. It looks like the schedules. Looks like his time that -- yeah -- his times that he punched in and out.

Q. That was going to be my -- along the line of the question I was going to ask you. Do these appear to be work schedules or hours worked?

A. To me, it looks like -- it looks like times he was scheduled and then the time that he actual worked. Like, for instance, on July 2nd, looks like he was scheduled 8:00 to 2:00 p.m., and it looks like he worked, like, 7:59 a.m. to 9:21 a.m. So I would say it's both, schedules and actual time worked.

Q. If you could go to Bates 371.

A. Okay.

Q. And I'm just trying to get a little bit of clarification. Because, like, if you'll notice at the top left, it's saying the range selected is to 6/5/2023. But then we were looking at the chart here with the schedule, and it basically goes beyond

Page 90

6/5. So do you understand what my confusion is here?

MS. DeVENEY: Do you want me to answer, or you want him to answer?

MR. MURPHY: Feel free.

MS. DeVENEY: The -- the date range is 5/27/22 to 6/5/23. So those first June dates are '22.

MR. MURPHY: Got you. Okay.

Q. (By Mr. Murphy) And what system did, basically, Hy-Vee use to keep track of the employees' work schedule and -- and hours worked?

A. Kronos.

Q. Was it like a clock-in-clock-out-type system?

A. Yes.

Q. Did you ever specifically review any of these records regarding Mr. Stewart's work schedules or times clocked in or out before today?

A. No.

(Exhibit Number 16 was marked for identification.)

Q. (By Mr. Murphy) Going to hand you what is marked as Exhibit 16. Have you ever seen these receipts before?

Page 91

A. I don't recall seeing them. I may have. I don't know what these are -- what these -- I need more information, I guess, as to what they are.

Q. I'll represent to you that I believe these were or may have been purchases made by Mr. Stewart in the store. You talked a little bit about reviewing some receipts that Mr. Stewart had brought to you; right?

A. Yes.

Q. So did these look like any of the receipts that you had reviewed?

A. I don't recall at this time. It's been so long. I mean, some of these date back -- back into May. I don't know what relevance that would have.

Q. Would you agree that almost all of these purchases are over $1.50?

MS. DeVENEY: Objection. Document speaks for itself.

A. I mean, these -- I mean, they speak for themself.

Q. (By Mr. Murphy) Is that -- where is a receipt like this kept?

A. So, of course, the customer will get a copy after they pay. And then I'm sure there's a -- there's got to be a -- somewhere in the computer

Page 92

system where they're held for all the registers.

(Exhibit Number 17 was marked for identification.)

Q. (By Mr. Murphy) Now I'm going to hand you Exhibit 17. Would you agree this is basically the job description for a produce clerk?

A. Yes.

Q. And is that the job that Chris was on?

A. Yes.

Q. Is there anything in addition to this job description that you think would basically be helpful to know as far as the job duties of a produce clerk?

MS. DeVENEY: Objection. Form of the question.

A. I mean, this pretty much tells what that job is.

Q. (By Mr. Murphy) How many produce clerks are there in the produce department?

A. Really, every employee that works back there would be considered a produce clerk.

Q. What do you mean "that works back there"?

A. Well, I should say everybody that works in produce, unless they're the manager, would be classified as a produce clerk.

Page 93

Q. Are there very many employees in the produce department that have five or more years of experience working at Hy-Vee?

A. There's several that have more than five.

Q. Some other departments?

A. Well, there's -- I think you asked if there was more that -- more that had five -- more than five years in produce.

Q. Okay.

A. So there's more than five in produce that would have more than five. And then throughout the store, there's numerous employees that have 10 years, 15 years, 20 years.

Q. How many employees work in the produce department?

A. I think I answered that earlier, but I think probably eight to ten.

Q. You think about half of those people have -- half those employees have about five years of experience?

A. Probably close.

Q. Do you recall any other conversations that you've had with Barry Stewart regarding Chris's separation from employment?

A. No. I mean, like I say, I talked to him

Page 94

about it that first day when we -- when he -- when we termed him, but Chris's -- what Chris did had no reflection on -- on what Barry does, and we don't discuss it.

Q. Did Barry ever tell you anything about his opinion as far as Chris's separation from employment?

A. No.

Q. Do you think he was upset or indifferent towards -- towards the -- Chris's separation?

MS. DeVENEY: Objection. Form and foundation.

A. To my knowledge, no. I mean, he didn't -- he's not -- I mean, he's been a great department manager before and after this situation happened.

Q. (By Mr. Murphy) Okay. So your position -- well, just you don't think he was upset? Is that what you're saying?

MS. DeVENEY: Objection. Form and foundation.

A. No.

Q. (By Mr. Murphy) You don't think he was upset or ...

A. No, I don't think he was upset.

Q. Sure.

Page 95

Do you recall talking to anyone else regarding Chris's separation from employment either whenever the decision was being made to terminate him, during his termination, or after the fact?

A. No.

Q. Okay.

MR. MURPHY: Let's go off the record. I think I'm done, but I just want to make sure.

MS. DeVENEY: Okay.

(A recess was taken.)

Q. (By Mr. Murphy) So a few more questions. So with respect to the video that we no longer have, did you review the video or any video to see whether Chris had paid for items at any point during that weekend?

A. No.

Q. Did you ever review anything regarding Chris -- did you ever look at anything at any point in an investigation to determine whether -- if Chris had periodically made purchases, like, in the morning before his shift or during the afternoon after his shift?

A. I think the day that -- the day in discussion, I had Alyssa look at video and try to look for receipts where he had paid for those items

Page 96

that he had took.

Q. And did she tell you one way or the other whether there were any receipts or ...

A. There were no receipts with the merchandise that he had taken.

Q. But I'm saying were there any receipts at all for the items he had purchased?

A. I -- I think he actually produced receipts that he had purchased stuff that day of the theft. I think he brought those to me. But they didn't match up the times that he had went through the check lanes when he was leaving.

Q. Okay. Well, let's just assume, for purposes of this hypothetical I'm about to ask you, that he purchased stuff at some point during that day of June 3rd, 4th, whichever it was, where he was allegedly caught on video walking out of the store without buying the chips. Let's assume that he mistakenly walked out of the store with the chips, and he's, like, "It's a mistake." Okay. It's hypothetical. It's -- he's like, "I made a mistake to the tune of $1.50." Assuming that, for purposes of this hypothetical, those facts and he did not intend to steal anything, in that situation would you still fire Mr. Stewart?

Page 97

MS. DeVENEY: Objection. Form of the question.

A. If he would have consciously left the store and got out in the parking lot and said -- and realized that he didn't pay for it, and he came back in and said, "Hey, I forgot to pay for this," I wouldn't have seen that that was intent. He wouldn't have got fired.

Q. (By Mr. Murphy) Okay. And so ...

A. Honestly, you know what? Honestly, I wish I had the video. You know, the video has been brought up a lot. I wish we had it. Because if we had the video, this is a cut-and-dry case of him picking up the merchandise, bagging it, walking right through the self-checkout without any hesitation, and leaving. And never looking back, never calling saying, "Hey, I screwed up," coming back -- coming back in the store later that day. None of that ever happened.

Q. But we don't have the video; right?

A. No. And we've had that discussion over and over and over. The videos -- we had no intent -- at the time of the theft, like we've said over and over, it's a loop video. At the time of the theft, we would have no reason to even try to

Page 98

keep the video.

Q. Well, he filed a claim for unemployment compensation benefits; right?

A. Yes.

Q. And Hy-Vee used the video to try to prevent Mr. Stewart from obtaining unemployment compensation benefits; correct?

MS. DeVENEY: Objection. Misstates the evidence.

A. Yes.

Q. (By Mr. Murphy) Let's also assume, to extend the hypothetical, Mr. Stewart thought he did pay for the items. He gets sidetracked talking to an employee, coworker and just does not even realize it. Under that scenario, would you still fire him?

MS. DeVENEY: Objection. Form of the question.

A. It's -- it's the same question over and over that you're asking.

Q. (By Mr. Murphy) Right. And I -- I --

A. And he --

Q. -- mean, did --

A. I mean, there's -- we can assume all day long what he was thinking or what he could have done or should have done. I mean, it's obvious he -- you

Page 99

had mentioned he had paid for stuff earlier. He should have paid for it. This -- we wouldn't even be sitting here today.

Q. And, in hindsight, where Mr. Stewart has been a good employee, hasn't had any issues of disciplinary action against him, and assuming it was a mistake, would you have given him some sort of lesser disciplinary action, sitting here today?

MS. DeVENEY: Same objections.

A. Lots of good employees make bad decisions. It happens. He made a poor decision, and he paid for the consequences because of it.

Q. (By Mr. Murphy) Okay. How do you know it was a decision and it wasn't a mistake?

A. If it was a mistake, don't you think he would have came to us and said, "Hey, I" -- "I left the store and didn't pay for this merchandise"? Mr. Stewart never -- never, ever tried to make the situation right till after he was caught. That's when Mr. Stewart tried to make the situation right -- is after he was found guilty.

If Mr. Stewart would have called me that afternoon on his way home and said, "Hey, Rod, I screwed up. I didn't pay for these."

"Okay. Chris, we'll take care of it when

Page 100

you get back to the store."

That -- none of that assuming ever happened until Mr. Stewart was found guilty. And then Mr. Stewart was trying to plead his innocence.

Q. Right. For $1.50 bag of chips.

A. Doesn't --

Q. You --

A. Doesn't matter.

(Reporter clarification.)

A. Doesn't matter. I've prosecuted -- I've prosecuted shoplifters for stealing 25-cent bag of M&Ms.

Q. (By Mr. Murphy) Okay. That was the question. When was that?

A. Years ago. I --

Q. When was -- no. When was it?

A. No. Listen. I have said from day one: You steal from me, you're going to be terminated. A -- I don't care if it's a dime, and I don't care if it's $10,000. You steal; you're getting fired.

Q. Who have you steal -- who have you terminated for taking a dime from you?

A. I used that as an example. It doesn't matter. The dollar amount doesn't matter. The principle of the matter is if you steal, you're

Page 101

getting terminated. Doesn't matter the dollar amount. Has nothing to do with the dollar amount.

Q. And all we can do -- would you agree? -- is look at who was terminated; right? And so in this instance, Mr. Stewart was terminated for allegedly stealing $1.50 worth of chips from Hy-Vee; right?

A. It wasn't "allegedly." He did steal it.

Q. Well --

A. He -- he took the merchandise from the store, put it in a grocery bag as though he paid for it, proceeded to leave the store, and did not pay for it. Had every opportunity. Walked by 20-some registers up front to pay, and made the choice not to.

Q. Okay. And I'm not going to go through everything. I think it's -- it's all in the record. Is there -- just to go back to that hypothetical, if Mr. Stewart had made an honest mistake of walking out of the store without realizing he had walked out with the $1.50 amount of chips, in that scenario would you terminate his employment?

MS. DeVENEY: Objection. Asked and answered. Form of the question.

A. You're asking me the same question over

Page 102

and over and over. And I've answered the question over and over and over.

Q. (By Mr. Murphy) And I will just tell you this is my only opportunity to get your information on the case prior to trial. And I understand sometimes it can feel that way as a witness, but this is information that my client is entitled to know.

And so is that what you would do, assuming that this was an honest mistake by Mr. Stewart?

MS. DeVENEY: Same objections. Asked and answered.

A. I've already told you. If Mr. Stewart made a mistake and approached me about making a mistake, he probably wouldn't have been terminated. The problem is Mr. Stewart did none of that until Mr. Stewart was called out about the situation. And then he claims he forgot or he -- whatever he -- he was going on about. But at the end of the day, if he would have came to us and said, "Hey, I made a honest mistake," the -- the outcome would have been different.

Q. (By Mr. Murphy) Okay.

MR. MURPHY: I don't think I have any other questions.

Page 103

MS. DeVENEY: I have just a few follow-ups.

EXAMINATION

BY MS. DeVENEY:

Q. Do you know what was submitted to the state? Like, what documents or evidence was submitted to the State in connection with the unemployment claim?

A. I -- I was told that the videos were -- or the pictures were submitted.

Q. Okay. The pictures but not the video?

A. Correct.

MR. MURPHY: Objection. Misstates prior testimony.

Q. (By Ms. DeVeney) Do you have -- well, do you believe that the actual video was sent to the unemployment?

A. No.

MR. MURPHY: Same objection.

Q. (By Ms. DeVeney) Did you have any involvement in sending information --

A. No.

MR. MURPHY: Same objection.

(Reporter clarification.)

MS. DeVENEY: Yeah. If you'll just hold

Page 104

off and let me finish my question.

A. Okay.

Q. (By Ms. DeVeney) Okay. Did you have any involvement in sending in information to the unemployment folks?

A. No.

MR. MURPHY: Same objection.

Q. (By Ms. DeVeney) Okay. Totally different topic. Are there employees at your store and at your stores over time where -- who have been given accommodations to allow them to do their job?

A. Absolutely.

MR. MURPHY: Objection. Calls for speculation.

Q. (By Ms. DeVeney) How do you know that?

A. I've witnessed it. I mean, I had a pharmacy employee just weeks ago that had to have accommodations to where they had to have a stool because they had foot surgery. My produce right -- manager right now, you know, is -- made accommodations for him. He's in a boot because he is possibly going to have to have surgery.

I mean, we accommodate peop- -- at the end of the day, I want to take care of every employee I got. And we'll do whatever we can to accommodate

Page 105

them to keep them working and just doing -- do the -- as a person, you just do the right thing. If somebody is hurt, if somebody has issues, you do whatever you can to accommodate them to keep them in the workforce.

Q. Again switching topics, if you have an employee who takes merchandise and leaves the store, do you assume that there was intent to take the merchandise and leave the store?

A. I do.

MR. MURPHY: Objection. Misstates prior testimony.

Q. (By Ms. DeVeney) If you had an employee who walked out of the store with a pen that they were writing with or with an apron that they were wearing, would you assume that there was intent to steal that?

MR. MURPHY: Objection to the extent --

A. I don't feel there --

(Reporter clarification.)

MR. MURPHY: Objection to the extent it calls for him to misstate prior testimony.

Q. (By Ms. DeVeney) Go ahead.

A. I do not see -- if I walked -- if I had an employee walk out with a pen -- a Hy-Vee pen, I

Page 106

would not consider that intent. If it was something they were working with.

MR. MURPHY: Also calls for a legal conclusion.

MS. DeVENEY: That's all the questions I have.

MR. MURPHY: Sir, I just have, like, one or two -- like, legitimately, one or two follow-up questions.

EXAMINATION
BY MR. MURPHY:

Q. Do you think the right thing to do is to fire a guy that has had serious health conditions, has had exemplary performance reviews over a $1.50 bag of chips that he allegedly stole?

MS. DeVENEY: Objection. Form of the question.

A. The things that you brought up with his health conditions have nothing to do with his termination. And, again, it has nothing to do with the dollar amount. It has to do with the intent, and it has to do with he did what he did.

He took merchandise from the store, did not pay. And we've -- we've been down this road ten times, I think, today. But the things you just

Page 107

commented about about his health and all that had nothing to do with his termination. I bend over backwards for my people and have for 40 years.

Q. (By Mr. Murphy) My only other question is did you ever see Chris Stewart walking around with any type of boot or anything at work after his surgery?

A. I don't believe so.

Q. Well, I'm just asking because you just rattled off, like, two or three different people you saw, you know, had some sort of -- been maimed in some sort of way, and you had no idea that Chris had any sort of physical impairment or mental impairment. So I was just -- wanted to know.

MS. DeVENEY: Is that a question?

Q. (By Mr. Murphy) Yeah. How is -- how is that that you are aware of all these other employees' physical or mental impairments, but you have no idea about Mr. Stewart's?

MS. DeVENEY: Objection. Form and foundation.

A. How would I know about it unless he physically -- unless I can physically see it. It's not -- he doesn't have to share any of his impairments with me nor do most people do that

Page 108

unless -- unless we need to know about it to make accommodations for them to work.

But if -- if he -- if I knew he had any sort of issues, we would have bent over backwards to take care of him as we would for any other employee in the store.

Q. (By Mr. Murphy) Okay.

MR. MURPHY: That's all that I have.

MS. DeVENEY: I don't have any more questions.

If you'll send it to me, I'll ask him to review it.

THE REPORTER: Okay. Electronic? Do you take electronic copy?

MS. DeVENEY: Yeah. Electronic and scanned exhibits, please.

(The deposition concluded at 1:47 p.m.)

Page 109

CERTIFICATE OF REPORTER

I, Susan J. Muckenthaler, a Certified Court Reporter of the State of Missouri, do hereby certify:

That prior to being examined, the witness was first duly sworn;

That said testimony was reported by me at the time and place hereinbefore stated and was thereafter reduced to typewriting under my direction;

That the foregoing transcript is a true record of the testimony given by said witness;

That I am not a relative or employee or attorney or counsel of any of the parties or a relative or employee of such attorney or counsel or financially interested in the action.

Witness my hand and seal May 21, 2025.

          Susan J. Muckenthaler
          Missouri Supreme Court
          Certified Court Reporter

Page 111

SIGNATURE PAGE

RE: Chris Stewart v. Hy-Vee, Inc.

____ I certify that I have read my testimony and request that NO changes be made.

____ I certify that I have read my testimony and request that the above changes be made.

          _____
          Rodney L. Dolph

          Subscribed and sworn to before me this ____ day of _____, 20____

          _____
          Notary Public
          State of _____
          County of _____
          My commission expires _____

SJM

Page 110

ERRATA SHEET

RE: Chris Stewart v. Hy-Vee, Inc.

PG/LN     Correction and Reason for Change

____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____
____ _____

          _____
          Rodney L. Dolph

SJM