**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION**

| | | |
|---|---|---|
| CHRIS STEWART, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:24-cv-06123-RK |
| | ) | |
| HY-VEE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

Before the Court are two motions: (1) Plaintiff Chris Stewart's motion for sanctions, (Doc. 62), which is fully briefed, (Docs. 66, 71); and (2) Defendant Hy-Vee, Inc.'s motion for summary judgment, (Doc. 50), which is also fully briefed, (Docs. 51, 61, 65). After careful consideration, and for the reasons explained below, Plaintiff's motion for sanctions is **DENIED**, and Defendant's motion for summary judgment is **GRANTED**.

### Background and Procedural Posture

This employment discrimination case arises from the allegedly unlawful termination of Plaintiff Chris Stewart from the Hy-Vee located in St. Joseph, Missouri, on June 5, 2023. Plaintiff's two-count complaint alleges disability discrimination and age discrimination in violation of the Missouri Human Rights Act ("MHRA"). (Doc. 1-1.) Plaintiff was over 40 years old at the time of his termination and has been diagnosed with ulcerative colitis, rheumatoid arthritis, depression, bipolar II disorder, and osteomyelitis. Defendant terminated Plaintiff after another employee reported an incident on June 3, 2023, in which it appeared Plaintiff removed store product (specifically, bags of chips) from the employee discount rack and left the store without stopping at a self-checkout kiosk to pay for that product. Defendant's investigation into the employee's allegation—including viewing surveillance video footage within the store— determined that Plaintiff stole several bags of employee-discounted chips.

On June 18, 2023, after his termination, Plaintiff filed for unemployment benefits. Defendant contested Plaintiff's application for unemployment benefits, referring to the store's surveillance video in support of its decision to terminate Plaintiff for theft. Plaintiff's application for unemployment benefits was denied on August 7, 2023. Plaintiff filed this employment

discrimination lawsuit on August 16, 2024, in the Circuit Court of Buchanan County, Missouri; Defendant removed the case to federal court on October 4, 2024.

**Discussion**

Defendant seeks summary judgment as to both Plaintiff's claims for age and disability discrimination under the MHRA. While the summary judgment motion was being briefed, Plaintiff filed a motion for sanctions based on the non-production of the surveillance video taken at the St. Joseph Hy-Vee on June 3, 2023, which had been viewed by store management in the course of investigating the allegation of theft against Plaintiff. (Doc. 62.) Because Plaintiff's motion for sanctions requests, in part, relief in the form of inferring a dispute of material fact at the summary judgment stage, the Court begins with Plaintiff's motion.

## I. Plaintiff's Motion for Sanctions

Plaintiff seeks sanctions against Defendant for its alleged spoliation of the surveillance video of Plaintiff's conduct at the St. Joseph Hy-Vee on June 3, 2023, including the alleged theft of bags of chips. Defendant maintains surveillance cameras at its stores, including the store where Plaintiff worked. Thus, as part of the investigation prior to terminating Plaintiff, three Hy-Vee employees reviewed video footage from June 3, 2023, to determine whether Plaintiff had stolen product from the store. Pursuant to Defendant's standard video retention policy, the cameras store videos for approximately 30 days before looping back and recording over the video. (Doc. 51-6 at 16; Doc. 51-5 at 13.)

Plaintiff requests that, if the Court concludes Defendant intentionally deleted the video evidence, Plaintiff should receive an adverse inference instruction at trial. Plaintiff alternatively requests that, if the Court concludes Defendant was reckless or grossly negligent in its destruction of the video evidence, Plaintiff should receive a presumption of a factual dispute at the summary judgment stage and a spoliation charge to the jury. Defendant counters that it did not have a duty to preserve the video at the time it was recorded over, the video was recorded over after 30 days pursuant to its standard video retention policy (and thus, its deletion was not intentional), and that Plaintiff has failed to show prejudice as a result of the video being unavailable.

### A. Legal Standard for Spoliation of Evidence Sanctions

"To give an adverse inference instruction for spoliation that occurs before litigation starts, '(1) there must be a finding of intentional destruction indicating a desire to suppress the truth, and (2) there must be a finding of prejudice to the opposing party.'" *Martinez v. Triple S Props.*, No.

2

6:17-cv-03195-RK, 2018 WL 4658700, at *2 (W.D. Mo. Sept. 27, 2018) (quoting *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 463 (8th Cir. 2016)); *see also* Fed. R. Civ. P. 37(e)(2)(B) ("[O]nly upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: . . . [the Court] instruct the jury that it may or must presume the information was unfavorable to the party . . . ."). "Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Martinez*, 2018 WL 4658700, at *2 (quoting *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007)).[1]

### B.    Duty to Preserve

First, Defendant argues that it did not have a duty to preserve the video evidence prior to the commencement of this litigation just because Defendant relied on the video in terminating Plaintiff and opposing Plaintiff's application for unemployment benefits.

> The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation.

*White v. Jefferson City Mo. Police Dep't*, No. 2:21-cv-04189-NKL, 2022 WL 2135829, at *2 (W.D. Mo. May 13, 2022) (internal quotation marks omitted). Plaintiff relies on *Banks v. Enova Financial*, a case from the Northern District of Illinois, to support his argument that an employer has a duty to preserve evidence when it uses specific evidence to terminate an employee and then uses such evidence to oppose the employee's subsequent application for unemployment benefits. (Doc. 62 at 4 (citing *Banks v. Enova Fin.*, No. 10-C-4060, 2012 WL 12539830, at *4 (N.D. Ill. July 10, 2012)).) The Court does not find this case persuasive considering the lack of in-circuit case law regarding the duty to preserve evidence used against an employee in an unemployment proceeding and the facts and timeline in this case.

Plaintiff filed for unemployment benefits on June 18, 2023. While his application was pending and before his application was denied on August 7, 2023, the 30-day period for recording

---

[1] Thus, the Court may make credibility determinations in resolving Plaintiff's motion for sanctions. The Court has taken care to ensure that it distinctly analyzes Defendant's motion for summary judgment in accordance with the summary judgment standard, which does not permit the Court to make credibility determinations.

over video surveillance under Defendant's standard video retention policy elapsed (as of approximately July 3, 2023). While the duty to preserve may arise prior to commencement of suit, or even before a charge of discrimination is filed, courts have generally been unpersuaded that a duty to preserve exists in such circumstances absent "situations in which the employer was expressly, subjectively aware of the potential for future litigation by the employee." *See Nekich v. Wis. Cent. Ltd.*, No. 16-2399 (JNE/DTS), 2017 WL 11454634, at *2 n.1 (D. Minn. Sept. 12, 2017) (holding plaintiff "has not shown the prospect of litigation was reasonably foreseeable until [employer] learned [plaintiff] had filed an EEOC charge"). There is no indication that Defendant was subjectively or in fact aware of any potential for future litigation by Plaintiff or that Plaintiff indicated he had any discrimination complaints against Defendant prior to the filing of his charge of discrimination on November 20, 2023. *Cf. Valspar Corp. v. Millennium Inorganic Chems., Inc.*, No. 13-cv-03214 (ADM/LIB), 2016 U.S. Dist. LEXIS 178317, at *13 (D. Minn. Jan. 20, 2016) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (finding defendant's duty to preserve evidence was triggered four months before commencement of litigation, when the relevant people at the defendant corporation *actually* anticipated litigation); *Broccoli v. Echostar Commc'ns Corp.*, 229 F.R.D. 506, 510 (D. Md. 2005) (finding defendant's duty to preserve evidence was triggered when it was notified of sexual harassment and retaliation complaints at least thirteen months prior to plaintiff filing suit)).

Nor did Defendant have a reason to infer that there was a risk of litigation merely because Plaintiff filed for unemployment benefits. For example, HR Manager Cate Riddle testified that apart from Plaintiff, she had never had an unemployment claim from a terminated Hy-Vee employee that subsequently resulted in a charge of discrimination or lawsuit. (Doc. 51-2 at 22.) It seems unlikely that a duty to preserve evidence arises every time an employer terminates an employee and that employee seeks unemployment benefits. *See, e.g.*, *Nekich*, 2017 WL 11454634, at *2 (concluding that a duty to preserve evidence does not arise every time an employer initiates a disciplinary hearing against an employee because "the duty would be virtually unbounded" and the "duty to preserve . . . should require more than a mere possibility of litigation"). Thus, the Court concludes that the duty to preserve had not yet arose at the time of Plaintiff's unemployment benefits proceedings. Thus, there was not spoliation in this case because the video was recorded over (under Defendant's 30-day standard video retention policy) around July 3, 2023, long before

Plaintiff filed either a charge of discrimination (November 20, 2023) or the employment discrimination petition in the Circuit Court of Buchanan County (August 17, 2024).

### C. Intentional Destruction

Even if Defendant had a duty to preserve the video evidence prior to November 20, 2023, the Court concludes that Plaintiff has not shown that Defendant intentionally destroyed the video evidence or that Defendant desired to suppress the truth. Alternatively, Plaintiff argues that if the Court finds that Defendant was merely reckless or grossly negligent in deleting the video, Plaintiff should receive a spoliation charge. However, based on the relevant case law, Plaintiff must show intentional destruction for either form of sanctions sought herein.

Adverse inference instructions come in three main forms, which range in severity from instructing a jury that (1) certain facts are deemed admitted and must be accepted as true, (2) there is a mandatory, but rebuttable, adverse presumption, or (3) there is a permissible presumption, often referred to as a "spoliation charge," which the jury may believe or not believe and which the party alleged to have spoliated evidence may present evidence to rebut the charge. *Great Am. Ins. v. Twin Cities Dance & Ent. Co., LLC*, No. 23-cv-00767 (NEB/SGE), 2025 WL 1754485, at *10 (D. Minn. Mar. 5, 2025), *adopted by* 2025 WL 1772802 (June 27, 2025). Despite the distinction in severity, each of these forms of instructions is considered an adverse inference instruction in this circuit and thus requires a showing of intentional destruction. *Id.*; *see also Vogt v. MEND Corr. Care, PLLC*, No. 21-cv-01005 (WMW/TNL), 2023 WL 2414551, at *16 (D. Minn. Jan. 30, 2023). This interpretation is also supported by Rule 37(e)(2)(B) of the Federal Rules of Civil Procedure, which provides that "only upon finding that the party *acted with the intent* to deprive another party of the information's use in the litigation may: . . . [the Court] instruct the jury that it *may or must* presume the information was unfavorable to the party . . . ." (Emphases added). Thus, the Court considers whether Plaintiff has shown "intentional destruction indicating a desire to suppress the truth," and does not consider whether Defendant acted recklessly or negligently.

Plaintiff points to two "inconsistencies in the record" which he argues indicate that Defendant intentionally destroyed the video. First, Plaintiff argues that "Rod Dolph, Store Director, testified that he requested that or saw that video clips of Mr. Stewart from the day in question be saved," but that "no video clips were saved." (Doc. 62 at 5.) Second, Plaintiff argues that his unemployment claim was not adjudicated until long after the 30-day standard video

5

retention period, and questions whether the video was truly not submitted to the state agency as part of the unemployment benefits proceedings. (*Id.*)

First, as Defendant points out in its suggestions in opposition to Plaintiff's motion for sanctions, Plaintiff did not provide a citation to Dolph's alleged testimony requesting someone save the video. Defendant further represents that "Mr. Dolph testified to no such thing." After the Court's independent review of the evidence submitted in connection to Defendant's motion for summary judgment, and Dolph's deposition in particular, it appears that Plaintiff is relying on the following question and answer:

> Q. Okay. But you asked Alyssa [Lewis] to save – you asked her to pull the video; right? And then you used that video to terminate Chris Stewart; right?
>
> A. It was part of the evidence, yes.

(Doc. 51-5 at 16.) Dolph did not clearly testify that he asked Alyssa Lewis to save the video (as opposed to just "pull the video"). Counsel deposing Dolph modified the question as it was being asked. It is not clear that pulling the video (perhaps to watch it) is the same as saving it (i.e., downloading it to some system which would not be recorded over). Additionally, counsel asked a second question before permitting Dolph to answer the question about pulling the video. Thus, it is unclear which part of the question Dolph answered. Considering the broader context of Dolph's testimony, he testified that "[t]here would be no reason to actually save [the video]" and that Lewis "doesn't save the video. She would have got pictures from the video." (*Id.*) Which is exactly what happened in this case. Defendant retained "clippets," or still shots, from the video which itself was recorded over after 30 days. (*Id.* at 13.) Dolph's testimony does not indicate that the video was deleted intentionally. His testimony supports Defendant's argument that the video was recorded over after 30 days pursuant to its standard video retention policy.

Second, the Court is not persuaded by Plaintiff's argument questioning whether the video was truly not provided to the state agency during the unemployment proceedings, which extended beyond the 30-day video retention period. The parties received Plaintiff's unemployment case file during the proceedings in this case. That file did not include a video. (*See* Doc. 51-31.) The Court is unpersuaded that the unemployment file indicates any intentional destruction of the video.

Rather than intentional destruction, the Court concludes that the video was recorded over pursuant to Defendant's standard video retention policy. Plaintiff has not shown any indication of bad faith, intention to destroy the video, or intention to suppress the truth. *See Am. S.S. Co. v. Hallett Dock Co.*, No. 09-cv-02628 (MJD/LIB), 2013 WL 308907, at *9 (D. Minn. Jan. 25, 2013)

(denying sanctions for auto-deletion of emails where "if any emails existed, they were destroyed based on a routine document retention policy before litigation commenced, and there is no showing whatsoever of bad faith or an intent to suppress the truth"); *Martinez*, 2018 WL 4658700, at *3 ("The Court finds that there is no evidence of bad faith or intentional destruction of documents to suppress the truth. Defendant's regular business practice was to periodically burn files to avoid inadvertently disclosing confidential information on lease applications and credit reports."). As in *American Steamship Co.* and *Martinez*, there is simply no evidence of bad faith or intentional destruction of the video in this case. It was recorded over after approximately 30 days according to Defendant's standard video retention policy, not due to some intentional destruction intended to suppress the truth.

### D.      Conclusion

Therefore, because Defendant did not yet have a duty to preserve the video at the time it was recorded over, and alternatively because there is no evidence the video was intentionally destroyed, Plaintiff's motion for sanctions is **DENIED**.[2]

## II.      Defendant's Motion for Summary Judgment

Defendant seeks summary judgment against Plaintiff as to both counts of his two-count complaint. Defendant argues that Plaintiff cannot establish a prima facie case of either age or disability discrimination under the MHRA because he can point to no evidence suggesting his age or disabilities had any connection to his termination, and thus Plaintiff cannot establish the "motivating factor" element of his claims. Moreover, Defendant argues that even if he could establish a prima facie case of discrimination, Plaintiff cannot point to any evidence showing that Defendant's non-discriminatory reason for firing him—theft of product—is pretextual. Plaintiff argues that other employees at the St. Joseph Hy-Vee knew of his age and disabilities, that he was terminated abruptly, and that his termination differed from similar incidents; thus, he concludes that this gives rise to an inference of discrimination sufficient to establish a prima facie case. Moreover, Plaintiff argues he has provided evidence that Defendant's reason for his termination is pretextual.

---

[2] Having concluded that the video was not intentionally destroyed, the Court need not reach the issue of whether Plaintiff is prejudiced by the unavailability of the video. However, the Court notes that Plaintiff provides little support for his argument that he is prejudiced, merely citing Rule 26 of the Federal Rules of Civil Procedure in arguing that the video is relevant to the case and thus ought to have been produced to Plaintiff.

**A.     Legal Standard**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment on a claim if the movant has made a showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In applying this standard, the Court must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Recio v. Creighton Univ.*, 521 F.3d 934, 938 (8th Cir. 2008).  "Although we view the facts in the light most favorable to the non-moving party, we do not accept unreasonable inferences or sheer speculation as fact."  *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004).  The inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(c); *see also Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).  To controvert a factual position, Plaintiff must "refer specifically to those portions of the record upon which [he] relies."  *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (internal quotation marks omitted).  In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment."  *RSBI Aerospace, Inc. v. Affiliated FM Ins.*, 49 F.3d 399, 402 (8th Cir. 1995).  At the summary judgment stage, the Court may not make credibility determinations or weigh the evidence before it.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

**B.     Background**[3]

Plaintiff was born in 1979, and he was over 40 years old as of June 5, 2023.  Plaintiff was diagnosed with ulcerative colitis and related rheumatoid arthritis when he was approximately 15 or 16 years old.  When Plaintiff was in high school, he was also diagnosed with depression and bipolar II disorder.  Then, in 2017 or 2018, Plaintiff was diagnosed with osteomyelitis.  As a result

---

[3] Facts which are uncontroverted by the parties are included without further citation.  Where a party has attempted to controvert a fact, but does not actually controvert said fact, the Court notes the party's argument but adopts the fact which was not properly controverted.

of Plaintiff's osteomyelitis, Plaintiff had the big toe on his left foot amputated in 2018 and has neuropathy and nerve pain in his feet. Due to these conditions, Plaintiff cannot stand or walk often or for long periods of time without pain.

Plaintiff first worked for Hy-Vee in the Chinese Department of the Kansas City location from July 2011 to December 2011, at which point he left voluntarily. Plaintiff was rehired at the St. Joseph Hy-Vee location in June 2016 to work as a clerk in the kitchen. He was promoted to assistant kitchen manager and became a full-time employee in October 2017. In May 2018, Plaintiff took a leave of absence to have his big toe amputated. Plaintiff returned from his leave of absence in August 2018, and he remained employed as an assistant kitchen manager until he voluntarily resigned in May 2019.

Then, Plaintiff was rehired at the St. Joseph location in May 2021 as a part-time employee in the produce department; he became a regular-time employee in the produce department in May 2022.[4] As a produce department clerk, Plaintiff worked primarily in the trim room (as opposed to on the public-facing store floor), preparing and packing for sale produce items such as fruit and vegetable trays, caramel apples, and chocolate covered strawberries. Plaintiff also occasionally unloaded trucks, put product on the floor, and rotated stock in the cooler.

In June 2021, Plaintiff was seen by a doctor for an ulcer on his toe. He provided a note to Hy-Vee on June 4, 2021, stating that he could return to work on June 7, 2021, but must be allowed to sit when possible in a clean and dry environment. Thereafter, Hy-Vee provided Plaintiff with a chair, which he used when he needed to sit. Hy-Vee also allowed Plaintiff to miss shifts or leave work early due to physical pain or because he was struggling mentally. Plaintiff was able to perform the essential functions of his position with the ability to sit, with the help of his co-workers to carry things out when Plaintiff did not feel he could do that, and with the ability to take time off when he needed. Plaintiff was never disciplined for leaving work early or for not coming to work due to his disabilities, and Plaintiff never asked for an accommodation that he did not receive.

On June 3, 2023, Plaintiff clocked in for his shift at 7:17 a.m. and clocked out at 2:27 p.m. Sometime after 2:00 p.m., Richard "Archie" Kane (assistant seafood manager) was in the back room where the employee discount rack is located. After clocking out, Plaintiff took at least three

---

[4] Part-time employees at Hy-Vee are not guaranteed a particular number of shifts or hours and are not eligible for full benefits. "Regular-time" employees are guaranteed 30 hours a week, and "full-time" employees are guaranteed 40 hours a week; both regular-time and full-time employees receive benefits.

bags of chips off the employee discount rack.[5]  Kane witnessed Plaintiff take several bags of product off the rack as Kane was coming out of the freezer.  (Doc. 51-9 at 6; *Id.* at 10 ("I seen him taking products off, carrying them in his hand, and going back to the produce cooler.").)[6]  After picking up the bags of chips, Plaintiff went to the produce cooler and into the trim room, put the chips in a Hy-Vee bag, and then went to the restroom.  (Doc. 61 at 26, ¶ 101 (admitted).)  At the time Plaintiff put the chips in the bag, he had not paid for the bags of chips taken off the employee discount rack.[7]  The chips cost $.25 per bag.  Kane observed Plaintiff go to the produce cooler, walk out of the area carrying bags, and leave the store for the day.  (Doc. 51-9 at 8.)  Plaintiff thought he went to the self-checkout register, paid for the chips, and left; but Plaintiff does not remember paying for the bags of chips for sure.  Surveillance video taken between when Plaintiff clocked out and when Plaintiff left the store did not show Plaintiff paying for the bags of chips at any register, Plaintiff does not have a receipt for multiple bags of employee-discount priced bags

---

[5] The parties dispute whether the chips were "Kettle chips" brand as Plaintiff testified in his deposition, (Doc. 61-1 at 22), or "Deep River," as testified to by Hy-Vee's corporate representative. Regardless, in light of the other uncontested facts the Court finds that the brand of chips is irrelevant.

Plaintiff admits that he "took some chips from the discount rack."  (Doc. 61 at 25, ¶ 96.)

[6] Kane testified that he was "certain" Plaintiff took product off the employee discount rack:

A.  I'm certain he took it off that discount rack.

Q.  Okay.  So what is it, then, that you're certain he took off the discount rack?

A.  I don't know what the products was.

Q.  Okay.

A.  I seen him taking products off, carrying them in his hand, and go back to the produce cooler.

(Doc. 51-9 at 10.)  Plaintiff's attempt to controvert the fact that Kane saw Plaintiff take product off the shelf is unsuccessful.  At most, Kane's deposition testimony indicates that he was not sure what product Plaintiff removed from the shelf; however, Kane repeatedly confirmed that he saw Plaintiff take some product off the shelf.

Moreover, Plaintiff has admitted that he took "some chips from the discount rack" after clocking out for the day.  (Doc. 61 at 25, ¶ 96 ("Admitted that Plaintiff took some chips from the discount rack.").) Having conceded this point, Plaintiff's attempt to mischaracterize Kane's deposition testimony to argue he did not see Plaintiff actually remove product from the shelf falls flat.

[7] Plaintiff contests this fact by citing to evidence in the record indicating he purchased a single bag of Deep River potato chips at normal price earlier in the day.  This evidence does not controvert the fact that Plaintiff had not paid for multiple bags of employee-discount priced chips (whatever the brand) after his shift ended.

10

of chips from that day, and Plaintiff's debit card charges and bank account statements do not reflect any such purchase.

On June 5, 2023, the next day Kane reported for a shift (after witnessing Plaintiff take items from the employee discount rack), Kane reported Plaintiff's behavior to his direct supervisor Ed Weibe, stating that it looked very odd what Plaintiff had done. Kane told Weibe that Plaintiff "[took] the products off that discount shelf, [went] back into the cooler, and then [came] out with bags and not stopping at the register," and that Kane saw Plaintiff "go directly out the door" without paying.[8] (Doc. 51-9 at 8.) Weibe instructed Kane to talk to Rod Dolph (Store Director) about what he had seen, and Kane reported the same series of events to Dolph that he "had seen Chris taking off the discount rack back there, walking into the produce cooler carrying product; and when he left that produce trim room, he was carrying bags, and he had exited the store." (Doc. 51-9 at 10.)

Based on the information Kane told Dolph, Dolph asked Alyssa Lewis (then-manager of store operations) to review surveillance video of the area near the employee discount rack between 2:00 p.m. and 3:00 p.m. on June 3, 2023. Lewis reviewed the video and from her observation of the video indicated to Dolph that Plaintiff had removed several bags of chips from the employee discount rack and exited the store, seemingly without paying. Dolph also observed the video surveillance and came to the same conclusion. Dolph then asked Lewis to review all points of sale in the store around 2:00 p.m. to 3:00 p.m. to see whether Plaintiff used any of the self-checkout kiosks. Cate Riddle (HR manager) also reviewed the video surveillance to confirm whether it

---

[8] Plaintiff attempts to controvert the fact that Kane told Wiebe that he saw Plaintiff taking product off the employee discount rack, take them into the cooler, and walk out of the store without stopping at the register. In particular, Plaintiff argues that Kane testified that "he saw Plaintiff standing beside the rack but doesn't know if he took anything from the rack," (Doc. 61 at 29), and cites in support:

> Q. And you don't know how many items, if any, he removed from the employee discount rack; true?
>
> A. Correct.

(Doc. 51-9 at 10.) First, Kane's testimony when viewed in the full context of his deposition is consistent with his position that he saw Plaintiff take product from the employee discount shelf, but he was not sure how many or what product. Moreover, this testimony does not controvert the fact of what Kane *told Weibe*; it merely refers to what Kane himself saw.

11

demonstrated Plaintiff did not pay for the chips. She agreed with Dolph and Lewis that it appeared Plaintiff stole bags of chips.[9]

Later on June 5, 2023, another manager told Plaintiff that Dolph needed to talk to him and took Plaintiff to Dolph's office. Dolph asked Plaintiff if he had taken chips recently and told him they did not believe he had paid for the chips. Plaintiff responded that he thought he went to the register and paid for them, and that he did not intentionally take chips without paying. Mr. Dolph then said "theft is theft and we've got to terminate your employment." Hy-Vee has a policy against theft. That policy is contained in the employee handbook, which Plaintiff received a copy of during his employment. The policy states that "the following are examples of behaviors and conduct that will lead to discipline, up to and including termination of employment: . . . Theft or fraud, including removal of company property without authorization and theft of time . . . ." (Doc. 51-3 at 7.) This policy makes no distinction between accidentally and intentionally removing company property.

During the meeting, Plaintiff said he believed he had paid with his debit card and asked if he could bring proof that he had paid. Dolph told Plaintiff that he would not be terminated if he could produce proof that he paid for the chips. Plaintiff signed the termination form at the end of the meeting. After the meeting, and because Plaintiff indicated he thought he had paid with his debit card, Dolph asked Lewis to search Hy-Vee's purchase records using the last four digits of Plaintiff's debit card to see if Plaintiff had purchased anything on June 3, 2023, with his debit card. Lewis found no record of Plaintiff making any purchase from the time he removed chips from the employee discount rack (after he clocked out at 2:27 p.m.) to the time he exited the store (at 3:39 p.m.).[10] Plaintiff contacted his bank to ask if the bank could print anything relevant to the purchase of chips the weekend of June 3, 2023. Plaintiff then went to the bank to obtain a printout. The printout shows that Plaintiff made a purchase at Hy-Vee at 3:54 p.m. on June 3, 2023. There were

---

[9] Plaintiff argues that testimony based on the video is hearsay which should not be admissible. The Court includes the foregoing testimony regarding the video not for the truth of the matter (i.e., not to conclude Plaintiff definitively stole product based on the video testimony alone), but for the purpose of highlighting what the relevant decision-makers' states of mind were at the time of Plaintiff's termination (i.e., each thought that Plaintiff stole from Hy-Vee as a result of watching the video). Plaintiff has not controverted these facts apart from arguing that testimony relying upon the video should not be admitted.

[10] Once again, Plaintiff's purchase of a single bag of Deep River chips earlier in the day does not controvert the foregoing fact.

12

no bags of chips as part of this purchase.[11]  Plaintiff returned to the store on June 5, 2023, with the printout from his bank.  Plaintiff showed the bank document to Dolph, and Dolph told Plaintiff that the document did not prove Plaintiff paid for the chips.  Plaintiff agreed that he did not see a specific payment for the chips on that bank document.

Prior to his termination on June 5, 2023, Plaintiff did not have any conversations about his impairments with anyone at the "Manager Of" level[12] or above.[13]  Plaintiff only recalls having conversations with his brother Barry (produce department manager, which is below the level of "Manager Of"); Jeremy (Barry's assistant); Cole, Phil, and Linda (produce clerks); and Sam Ajuzie (kitchen department manager).  Beyond knowledge that Plaintiff walks with a limp, there is no evidence in the record that Kane, Dolph, Lewis, or Riddle, had knowledge of Plaintiff's disabilities.  Plaintiff's testimony to the contrary is purely speculative and need not be considered in resolving the instant motion for summary judgment.  *See Bloom v. Metro Heart Grp. of St. Louis, Inc.*, 440 F.3d 1025, 1028-29 (8th Cir. 2006) (noting speculation insufficient to defeat summary judgment).[14]

### C.  Prima Facie Case of Discrimination

Defendant first argues that Defendant is entitled to judgment as a matter of law on Plaintiff's MHRA claims because Plaintiff cannot show that his age or his disabilities were a motivating factor of his termination, and thus Plaintiff cannot establish a prima facie case of discrimination.  Missouri courts use the *McDonnell Douglas* burden-shifting analysis to evaluate

---

[11] The purchase included toilet paper, Simply Light drink mix, two Jarritos Mandarin sodas, and a 2-liter bottle of Sprite.

[12] At the St. Joseph Hy-Vee, "Manager Of" employees (such as Manager of Store Operations) are above "department managers" (such as produce department manager), assistant department managers, and clerk-level employees (such as produce clerks), in the employee hierarchy.

[13] Plaintiff attempts to controvert this fact, stating "[u]pper management and HR knew about [his impairments]." (Doc. 61 at 17, ¶ 65.)  Plaintiff cites to his deposition testimony in which he speculates that "[u]pper management knew about it, HR because of, you know, doctors' notes that I turned in when . . . requested." (Doc. 61-1 at 13.)  However, this does not controvert the proposition that Plaintiff did not have *conversations* with people at this level of management.  Nor does it show that Dolph, Lewis, or Riddle had knowledge of his impairments.

[14] Plaintiff's testimony admits his lack of knowledge on this issue.  For example, he admits that he "can't, like, pinpoint that this person knew or this person knew.  I think it was kind of a well-known thing that I had . . . impairments." (Doc. 61-1 at 13.)  As further example, Plaintiff admits that "I can't, you know, *speculate* on how much Rod [Dolph] knew, but I know he knew . . . I had impairments." (*Id.* (emphasis added).)

proof in employment discrimination cases at the summary judgment stage. *See Eivins v. Mo. Dep't of Corr.*, 636 S.W.3d 155, 166 (Mo. Ct. App. 2021). First, Plaintiff has the burden to establish a prima facie case of discrimination under the MHRA. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If Plaintiff establishes a prima facie case of discrimination, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the termination. *Id.* The burden then shifts back to Plaintiff to show that Defendant's reason for the action is merely pretext for discrimination. *Id.* at 803-04.

To establish a prima facie case for age discrimination under the MHRA, Plaintiff must show: "(1) [he] suffered an adverse employment action; (2) [his] age was the motivating factor; and (3) [he] suffered damage as a result." *Johnson v. Midwest Div. – RBH, LLC*, 88 F.4th 731, 737 (8th Cir. 2023) (*citing Eivins*, 636 S.W.3d at 166). Similarly, to establish a prima facie case for disability discrimination under the MHRA, Plaintiff must show: "(1) [he] was disabled, (2) [he] was discharged, and (3) [his] disability was the motivating factor in [his] discharge." *Ashby v. Woodridge of Mo., Inc.*, 673 S.W.3d 537, 544 (Mo. Ct. App. 2023). To be considered a "motivating factor," Plaintiff's age or disability must have "actually played a role in the adverse action or decision and had a determinative influence on the adverse decision or action." Mo. Rev. Stat. § 213.010(19).

Plaintiff may not rely merely on his age or disability to establish a prima facie case, and instead, Plaintiff must provide at least *some* evidence that his age or disability actually contributed to his termination. *See Williams v. FedEx*, No. 4:21-cv-00980-PLC, 2022 WL 179232, at *3 (E.D. Mo. Jan. 20, 2022) (concluding in ADEA context that plaintiff must provide more facts than just his age to find an inference of age discrimination); *see also Johnson v. Westinghouse Air Brake Techs. Corp.*, No. 22-cv-00560-GAF, 2023 WL 6037434, at *10 (W.D. Mo. Aug. 8, 2023) ("A plaintiff's protected status alone does not create a triable issue."), *aff'd*, 104 F.4th 674 (8th Cir. 2024); *Lewis v. SW Bell Tel. Co.*, No. 20-cv-03373-SRB, 2022 WL 891630, at *6 (W.D. Mo. Mar. 25, 2022) (granting summary judgment where plaintiff demonstrated nothing more than membership in protected class).

Plaintiff argues that he can establish prima facie cases of age discrimination and disability discrimination by raising an inference of discrimination due to (1) Defendant's abrupt termination of Plaintiff for alleged theft, which Plaintiff argues differed from Defendant's handling of other similar incidents or incidents of comparable seriousness, and (2) the decision-makers' knowledge

14

of Plaintiff's age and disabilities. Defendant argues that it invariably terminates employees for theft of store product—regardless of age or disability status, and that the decision-makers involved in Plaintiff's termination were unaware of his disability and upcoming surgery.

### 1. Age Discrimination

Plaintiff's summary judgment opposition brief centers largely on Plaintiff's disability discrimination claim. In Plaintiff's opposition, he sets forth no specific direct or circumstantial evidence that explains how Plaintiff's *age* was a motivating factor in his termination. Plaintiff merely refers to one incident in which two employees who were approximately 16 years old engaged in "derogatory conduct against one another," including "[t]he Hispanic employee ma[king] monkey sounds at the African American employee as an apparent racist joke." (Doc. 61 at 55, ¶ 30.) Neither employee was terminated by Defendant in that instance. "Employees are similarly situated if they are accused of 'similar conduct and are disciplined in different ways.'" *Jain v. CVS Pharm., Inc.*, 779 F.3d 753, 759 (8th Cir. 2015) (quoting *Williams v. Trans State Airlines, Inc.*, 281 S.W.3d 854, 873 (Mo. Ct. App. 2009)). The Court finds that this incident does not provide circumstantial evidence that age is a motivating factor in the case at bar, as the misconduct at issue in that example is materially different from that in this case—alleged theft of product. *See id.* (finding plaintiff and other employee were not similarly situated, despite both having manager performance issues, because the plaintiff's performance issues were more severe); *see also Pete v. Walgreen Co.*, No. 15-cv-00476-ODS, 2016 WL 4443187, at *3-4 (W.D. Mo. Aug. 19, 2016) (finding plaintiff's "record of discussion," which included addressing issues involving inventory and pricing issues, was more severe than another employee's record of discussion addressing use of foul language, and concluding the other employee was not similarly situated).

As to the individuals accused of and terminated for theft of product or money at the St. Joseph store during the last five years, their ages range from 18 to 71 years old. The other termination due to theft that Dolph was personally involved in concerned a 32-year-old employee. Thus, based on the uncontroverted record regarding employees terminated for theft, Defendant terminates employees for theft regardless of their age. In other words, when Defendant suspects an employee of theft, younger employees are not treated more favorably than older employees— both are terminated. Additionally, Defendant has demonstrated that they hire and continue to employ people of all ages. The St. Joseph location employs 91 full-time and regular-time

employees, 48 of whom are more than 40 years old, 31 of whom are more than 50 years old, and 17 of whom are more than 60 years old. Thus, many of the employees at the St. Joseph location are older than Plaintiff and have not been terminated (nor have they been accused or suspected of theft).

Ultimately, the Court concludes that Plaintiff has failed to point to any evidence in the summary judgment record to establish that his age was a motivating factor in Defendant's termination decision. This alone is sufficient to grant Defendant summary judgment on Plaintiff's age discrimination claim.

### 2. Disability Discrimination

Second, Plaintiff has not shown through direct or circumstantial evidence that his disabilities were a motivating factor in his termination. In order for a disability to be a motivating factor in an adverse employment decision, the decision-makers involved must have knowledge of Plaintiff's disability. *See Cosby v. Steak N Shake*, 804 F.3d 1242, 1345-46 (8th Cir. 2015) (finding MHRA disability discrimination claim failed because record did not show that disability was a motivating factor in plaintiff's demotion, as employer had no knowledge of his disability at the time it decided to demote plaintiff); *see also Miller v. Nat'l Cas. Co.*, 61 F.3d 627, 630 (8th Cir. 1995). Here, the only evidence in the record Plaintiff can provide in support of his contention that his employer knew about his disability is speculation on Plaintiff's part. The remainder of the record indicates that the actors involved in Plaintiff's termination—Kane, Dolph, Lewis, and Riddle—were not aware of Plaintiff's disability except for the observable fact that he walked with a limp.

The Court, even construing facts in favor of the nonmoving party, need not rely on "sheer speculation." *Howard*, 363 F.3d at 800. However, speculation is precisely how Plaintiff attempts to establish that these actors knew about his disability and upcoming surgery. For example:

Q. What information do you believe Rod [Dolph] has about your plan to be out [for surgery]?

A. Like I said, I can't say to any – you know, that he had anything, you know, in writing or, you know, like that, but it was well-known that I was going to be out for surgery.

Q. What causes you to believe that?

A. Because I had – again, Hy-Vee is kind of a small store and word gets around . . .

16

(Doc. 51-1 at 15.)  Plaintiff during his deposition even admitted that his testimony regarding what Dolph knew about his disabilities was speculative:

> Q. . . . Do you know what information Rod Dolph had about your impairments or your treatments or your impairments?
>
> A.  I wasn't real close with Rod, my brother was, and – but again, Hy-Vee is a small store here in St. Joe.  I can't, you know, speculate on how much Rod knew, but I know he knew.

(Doc. 51-1 at 13.)  All that the record indicates is that the actors involved in Plaintiff's termination knew that he walked with a limp, not that he had any disability or need for accommodation.  Therefore, his disabilities could not be a motivating factor in his termination.  *See Cosby*, 804 F.3d at 1345-46; *Moye v. Kansas City S. Ry. Co.*, No. 15-cv-00423-GAF, 2018 WL 11411322, at \*9 (W.D. Mo. Aug. 22, 2018).

Even assuming that some actor involved in Plaintiff's termination was aware of Plaintiff's disabilities, the Court concludes that Plaintiff has failed to show direct or circumstantial evidence indicating that any of Plaintiff's disabilities were a motivating factor in his termination.  Plaintiff argues that Defendant's termination of Plaintiff was abrupt and deviated from the way it handled similar situations of comparable seriousness, and that this gives rise to an inference of disability discrimination.  In support, Plaintiff relies on facts such as "[o]ther Hy-Vee employees frequently took store property, like aprons and pens, home without paying for them and did not receive disciplinary action."  (Doc. 61 at 54, ¶ 25.)  However, the deposition testimony cited does not reference discipline and, read in its broader context, the testimony makes a distinction between employees taking store product (such as bags of chips off the employee discount rack) and items used in connection with an employee's work (such as an apron or pen, not for sale in the store).  Thus, even assuming that Defendant does not discipline employees for removing from the store items used in connection with their work, these instances do not give rise to circumstantial evidence of discrimination because Plaintiff was terminated for theft of *store product*.

Plaintiff's conflation of these two distinct situations is not compelling.  Defendant's facts regarding consistently terminating employees for theft of store product or money are uncontroverted.  Moreover, nothing in the record indicates that any of these employees terminated for theft suffered from disability.  Therefore, the uncontroverted record as it relates to termination for theft of product reflects that disability plays no role in such decisions. Moreover, the St. Joseph Hy-Vee regularly accommodates employees by providing stools, allowing additional breaks,

allowing reduced schedules, and helping with lifting requirements. St. Joseph Hy-Vee employees regularly take leaves of absence for medical reasons. In May 2018, Plaintiff himself took a leave of absence from the St. Joseph store to have a toe amputated. In August 2018, Plaintiff returned from his leave of absence and remained employed in the same position until May 2019 when he voluntarily resigned.

Apart from arguing that Defendant treated other similar situations differently (i.e. Defendant did not fire people for taking items related to their job from the store), Plaintiff provides no evidence which would connect the termination decision to his disabilities. *See, e.g.*, *Morrow v. Guitar Ctr. Stores, Inc.*, No. 4:21-cv-00721-DGK, 2023 WL 2531734, at \*6 (W.D. Mo. Mar. 15, 2023) (granting summary judgment and concluding disability was not a motivating factor where "there is no evidence [supervisors] made comments or statements about [plaintiff's] disability or treated him differently from non-disabled coworkers"); *see also McConnell v. Pioneer Hi-Bred Int'l, Inc.*, 260 F.3d 958, 958 (8th Cir. 2001) (affirming summary judgment where plaintiff "failed to submit evidence of conduct or statements inferring that disability discrimination was the motivating factor in [employer's] decision to dismiss [plaintiff]"). Here, Plaintiff was treated the same as non-disabled coworkers suspected of theft of store product; all who have been identified in the record before the Court were terminated. Moreover, Plaintiff admits that Plaintiff's supervisor never said anything Plaintiff felt was insensitive or inappropriate in terms of asking Plaintiff to be at work and that Plaintiff's supervisors said things to motivate him in an uplifting way, but no one ever criticized his work performance. (Doc. 61 at 16, ¶ 58; 17, ¶ 64.)

Ultimately, the Court concludes that Plaintiff has failed to point to evidence on which a reasonable jury could rely to find that relevant decision-makers had knowledge of Plaintiff's disabilities and that his disabilities were a motivating factor in Defendant's termination decision. This alone is sufficient to grant Defendant summary judgment on Plaintiff's disability discrimination claim.

## D. Non-Discriminatory Reason for Termination

Even if Plaintiff had established that his age or disabilities were a motivating factor in his termination (which the Court finds he did not), the Court further finds that Defendant is entitled to judgment as a matter of law under the *McDonnell Douglas* burden shifting standard because it has provided a sufficient non-discriminatory reason for terminating Plaintiff, and Plaintiff has not shown that this reason for his termination was pretext for discrimination.

Defendant's non-discriminatory reason for Plaintiff's termination is theft of store product. Defendant concluded that Plaintiff stole at least three bags of employee-discounted chips from the St. Joseph Hy-Vee location on June 3, 2023. This was based on Kane's report to Dolph on June 5 regarding Plaintiff's conduct on June 3, three individuals' review of surveillance video of Plaintiff, a short meeting with Plaintiff, and Plaintiff's inability to provide any receipts or bank records which supported his claim that he paid for the chips.

Theft meets Defendant's burden of producing a legitimate non-discriminatory reason for Plaintiff's termination. *See Britton v. City of Poplar Bluff*, 244 F.3d 994, 997 (8th Cir. 2001) ("We do not question that theft is a legitimate ground for termination . . . and thus find that the city has met its burden to produce a legitimate, non-discriminatory basis for its action."); *see also Smith v. Monsanto Chem. Co.*, 770 F.2d 719, 722-23 (8th Cir. 1985) (reaching pretext issue where non-discriminatory reason for adverse employment action was theft).

### E.      Pretext

Thus, the burden shifts back to Plaintiff to show that Defendant's stated reason for his termination is pretext for discrimination. A plaintiff may demonstrate a material question of fact regarding pretext in at least two ways:

> [1] A plaintiff may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact. [2] Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer. Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (internal quotation marks omitted).

Plaintiff argues he has provided evidence that Defendant's non-discriminatory reason is pretextual because (1) Defendant cannot provide documentation of its non-discriminatory reason, (2) Defendant did not follow its own theft policy and made a sudden decision to terminate Plaintiff after little to no investigation, (3) Defendant did not terminate similarly situated younger or non-disabled employees for similar conduct or conduct of comparable seriousness, or (4) alternatively, Defendant's non-discriminatory reason for firing Plaintiff is false. The Court finds each of these arguments unpersuasive and concludes that Plaintiff has not demonstrated a material question of fact that Defendant's non-discriminatory reason for terminating him is pretextual.

### 1. Documentation of Non-Discriminatory Reason

First, Plaintiff argues that Defendant's reason for terminating him is pretext for discrimination because Defendant does not have any documentation supporting its contention that Defendant terminated Plaintiff because of theft, because the surveillance video from June 3, 2023, has been recorded over. Plaintiff admits that he took three bags of chips from the employee discount shelf, thought he had paid for them, and then took them home with him. (Doc. 51-13 at 3.) As previously discussed, the uncontroverted facts establish that there were no purchases for any employee-discounted chips at any self-checkout kiosk on June 3, 2023. Plaintiff also does not have a receipt showing he paid for the chips; his bank statement also did not support his belief that he paid for the chips. Defendant's purchase records reflect that there were no purchases made for any Kettle brand or Deep River brand potato chips on June 3, 2023, between the time Plaintiff clocked out and when he left the store. (Doc. 61 at 45, ¶¶ 176-79.)[15] Thus, there is documentary support for Defendant's stated reason for terminating Plaintiff.

Moreover, Plaintiff relies solely on *Wallace v. DGT Operations, Inc.*, 442 F.3d 1112 (8th Cir. 2006), in making this argument. *Wallace* is, at best for Plaintiff, inapposite in this instance, and at worst helpful to Defendant. In *Wallace*, the Court concluded that the employer's reason for terminating the plaintiff—a downturn in business leading to overstaffing and the need for lay-offs—was pretextual. This was, in part, because plaintiff's supervisors "claimed that they had previously discussed the general issue of manager overstaffing and lay-offs. These claims, however, were undocumented, and a finder of fact could infer that the purported loss of data by supervisors . . . calls into doubt the truth of their claims." *Id.* at 1122.

Here, however, the record indicates that Plaintiff's supervisors had previously discussed the general issue of theft of product by employees. Defendant has a policy against theft. The policy is contained in the employee handbook, of which Plaintiff received a copy. Other employees have been terminated from the St. Joseph store for theft. Thus, unlike in *Wallace* where there was no documentation about the "general issue of manager overstaffing and lay-offs," which was then

---

[15] Plaintiff denied facts 178 and 179, however, Plaintiff failed to properly controvert those facts. For example, in response to "There were no purchases of *multiple bags* of Deep River potato chips at any point in time on June 3, 2023," (Doc. 61 at 177 (emphasis added)), Plaintiff stated "Denied. Plaintiff had paid for Deep River brand chips earlier that day," referring to an exhibit which shows Plaintiff purchased *a single bag* of Deep River brand chips earlier that day.

20

used as the reason for terminating the plaintiff, here, there is ample documentation of Defendant's general policy against theft and documentation showing Defendant enforces its policy.[16]

## 2. Defendant's Theft Policy and Investigation

Second, Plaintiff argues that Defendant failed to follow its theft policy when it terminated Plaintiff because (1) accidentally removing an item from the store is not considered theft under the policy, and (2) Defendant did not adhere to its policy of investigating the alleged theft as evidenced by Defendant "not . . . know[ing] whether anyone at its store ever asked Plaintiff if he had accidentally forgotten to pay for the bag(s) of chips it alleges Plaintiff stole." (Doc. 61 at 63.)

Taking Plaintiff's arguments in reverse order, the latter is wholly unsupported by the record. It is uncontroverted that Defendant conducted an investigation to determine whether Plaintiff stole bags of chips from the store prior to terminating him. Dolph spoke with employee Archie Kane regarding what he observed, then three supervisory employees reviewed surveillance video, Defendant reviewed its purchase records for the relevant time period, and Dolph had a meeting with Plaintiff during which he "asked Plaintiff if he had taken chips recently and told him they did not believe [Plaintiff] had paid for the chips." (Doc. 61 at 36, ¶ 135 (admitted).) Thus, the record clearly reflects that Defendant investigated the allegation of theft prior to terminating Plaintiff and asked Plaintiff whether he had paid for the bags of chips. As for Plaintiff's allegation that the termination was "abrupt" (only two days after the alleged theft), the record reflects that terminations due to allegations of theft may occur within days of the conduct. (Doc. 54-2 at 3 (theft on October 16, 2019, termination on October 18, 2019).)

Plaintiff also argues that any removal of bags of chips on June 3, 2023, by Plaintiff was accidental rather than intentional, and that accidental removal of store property is not "theft" under Defendant's theft policy. Defendant's policy against theft states that "the following are examples of behaviors and conduct that will lead to discipline, up to and including termination of employment: . . . Theft or fraud, including removal of company property without authorization and theft of time . . . ." (Doc. 51-3 at 7.) This policy makes no distinction between accidentally and intentionally removing company property. Plaintiff argues that Defendant's corporate representative, Alyssa Lewis, testified that the theft policy requires an intent to steal, and does not

---

[16] While the video surveillance of Plaintiff on June 3, 2023, may have provided additional documentary evidence had it not been recorded over, the Court need not rely on the unavailable video surveillance here because the uncontroverted facts otherwise show that Plaintiff did not pay for any employee-discounted chips on June 3, 2023.

include accidentally taking something from the store. Upon reading the relevant portions of the deposition, Lewis clearly delineates between taking something like a pen or apron used in an employee's work (and not available for sale in the store) and someone taking store product out of the store. (Doc. 61-2 at 10.) The records of employee terminations due to theft of store product or money further show Defendant's theft policy as it relates to store product, as they indicate that employees are terminated for theft of product or of cash. (*See generally* Doc. 54-2.)

The cases Plaintiff cites in support of its argument that an employer deviating from its practice gives rise to pretext involve situations where the employer actually did deviate from its policy or practice. Here, however, the record is clear that employees who remove product from the store without paying and without authorization are terminated as a result, regardless of intent. And practically speaking, this conclusion is logical as any employee could avoid termination under Plaintiff's theory of the theft policy by claiming that they did not intend to steal the product. "[T]he law does not authorize courts to sit as super-personnel departments reviewing the wisdom or general fairness of an employer's actions against an employee." *Sherman v. Collins*, 158 F.4th 904, 907 (8th Cir. 2025). It is not for the Court to question Defendant's theft policy, which clearly does not make a distinction between accidental removal of product and intentional removal of product.

Therefore, the Court is not persuaded by Plaintiff's argument that Defendant failed to follow its theft policy or failed to conduct an investigation prior to terminating Plaintiff such that would give rise to a material issue of fact as to pretext.

### 3. Similarly Situated Employees

Fourth, Plaintiff argues that he was treated differently than younger and non-disabled employees in similar situations or situations of similar severity. As previously discussed at length above in concluding that Plaintiff failed to provide any evidence that his age or disabilities were a motivating factor in his termination, the "similarly situated" employees, or similar situations Plaintiff refers to are off base. Plaintiff's situation is not comparable to employees who walked out of the store with items used in the course of carrying out their employment (rather than taking store product). Nor are Plaintiff's examples including other types of misconduct—such as derogatory comments—persuasive in light of the uncontroverted record that Defendant treats theft of product consistently across the board. In other words, Defendant consistently terminates employees (regardless of age or disability status) for theft. Therefore, Plaintiff's allegation that

22

similarly situated employees were treated more favorable is without basis in the record and does not establish an issue of material fact as to pretext.

### 4. Verity of Non-Discriminatory Reason

Finally, Plaintiff argues in the alternative that Defendant's non-discriminatory reason for terminating him is false (in other words, Plaintiff continues to contend that he did not steal bags of chips from the store on June 3, 2023) and that there is no "honest belief" defense available to Defendant in this case. Plaintiff cites *Newman v. Greater Kansas City Baptist & Community Hospital Association*, 604 S.W. 2d 619 (Mo. Ct. App. 1980), for the proposition that "[a] contention of honest belief constitutes no defense to the employer to a[n MHRA] action where there is evidence that the true reason for discharge was other than stated." *Id.* at 622 n.4. Plaintiff ignores, however, the remainder of the same footnote which states:

> In the absence of such prima facie proof [i.e. evidence that the true reason for discharge is other than the one stated], to allow recovery to a plaintiff despite honest belief for the reason stated elevates the cause of action to a status of employment for which only just cause suffices for termination.

*Id.* Thus, in cases such as this where a court concludes that there is no evidence indicating that the true reason for termination is other than the reason provided by the defendant (here, theft), the honest belief defense is available.

Moreover, in *Newman*, the court reversed the trial court's entry of judgment in favor of the plaintiff, finding that the employer had an honest belief that the employee committed theft. Thus, contrary to Plaintiff's contention, the "honest belief" defense is recognized and available in Missouri for MHRA claims. *See also Carmon v. Saks Fifth Ave.*, No. 4:19-cv-02855-AGF, 2021 WL 1312976, at *16 (E.D. Mo. Apr. 8, 2021) ("Showing that an employer's explanation for an employment decision is unworthy of credence . . . requires showing that the employer did not truly believe the employee engaged in the conduct justifying termination, not merely a showing that the employer's 'honest' belief was erroneous, unwise, or even unfair." (internal quotation marks omitted)) (addressing MHRA claim).

Considering Defendant's honest belief argument on its merits, the Court finds that it applies in this case because there is no genuine dispute of material fact which would indicate that Defendant did not truly believe that Plaintiff engaged in theft. The three employees who played a decision-making role in Plaintiff's termination—Dolph, Lewis, and Riddle—each reviewed surveillance video which left them with the belief Plaintiff stole bags of chips from the store

23

without paying.  As previously discussed, Defendant's honest belief is further supported by review of the sales records from the relevant time period and Plaintiff's lack of receipts or bank records indicating that he purchased any discounted chips on the day in question.

Thus, the record lacks any indication that Defendant's legitimate, non-discriminatory reason for terminating Plaintiff was pretext for discrimination.

### Conclusion

Accordingly, after careful consideration and for the reasons explained above, the Court **ORDERS** that Plaintiff's motion for sanctions, (Doc. 62), is **DENIED**, and Defendant's motion for summary judgment, (Doc. 50), is **GRANTED**.

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED:  January 12, 2026

24